UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LAURA ELKINS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-0480 (RMC) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Laura Elkins and John Robbins move for partial summary judgment to establish (1) that the building permits issued to plaintiffs for the renovation of their home at 20 9th Street, N.E. are valid and (2) that the search warrant dated March 26, 2003, upon which defendants raided plaintiffs' home and seized personal documents, is invalid.  Plaintiffs' motion is based on plaintiffs' attached Memorandum in Opposition to Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment and Plaintiffs' Statement of Material Facts to Which There Is No Genuine Issue.

There being no genuine issue of material fact with respect to plaintiffs' cross-motion, plaintiffs request that their Cross-Motion for Partial Summary Judgment be granted.

Respectfully submitted,

/s/

_____
Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.

Suite 410
Washington, D.C. 20036
(202) 822-6760
(202) 822-6774 (facsimile)

May 24, 2004                                    Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
LAURA ELKINS, *et al.*,                 )
                                        )
                 Plaintiffs,            )
                                        )
        v.                              )        Civil Action No. 04-0480 (RMC)
                                        )
DISTRICT OF COLUMBIA,  *et al.*,        )
                                        )
                 Defendants.            )
_____)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE
ALTERNATIVE, SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants describe this case as nothing but a "run-of-the-mill" local land-use

disagreement with "routine circumstances," and urge this Court to dismiss all causes of

action without further review.  Here, plaintiffs (Laura Elkins and John Robbins) sought

and obtained approval for their home repair and renovation plans of their neglected

Capitol Hill house from all interested District agencies, and paid all the requisite fees and

obtained all required permits and approvals — nine building, electrical, plumbing, and air

conditioning permits and six approvals.  Their next-door neighbor, who happened to be

an active member of the Capitol Hill Restoration Society, however, opposed some

aspects of the renovation and sued both the District and plaintiffs in March 2002,

challenging the validity of the permits. The District defended the validity of the permits,

and the District's Chief Building Inspector testified to the permits' validity.  Following

the Superior Court's denial of their neighbor's motion for a temporary restraining order,

he dismissed his lawsuits with prejudice, against both the District and plaintiffs.

1

Bowing to the continued political pressure from the neighbors, however, the District continued to issue Stop Work Orders to plaintiffs. Apparently to obtain evidence to support an action to revoke plaintiffs' building permit, the Administrator of the Building and Land Regulation, Denzil Noble, signed a false affidavit stating that there was an imminent threat to public safety and health, and sent approximately 12 agents out to the plaintiffs' home, including two environmental crimes agents and armed police officers. They arrived while Mrs. Elkins was at home with two sick children, and seized personal drawings, receipts, and records that they obtained from opening boxes and file drawers — in short, documents that were not in plain view. The search warrant authorized no document seizure.

Plaintiffs submit that these facts, set forth in their Complaint, amply state a claim for relief.  Plaintiffs further submit that defendants' motion for summary judgment should not be granted because all but two of the issues raised in defendants' motion are issues for which material facts are in dispute, and for which there has been no discovery.  For the two issues for which there are no material facts in dispute — the validity of the building permits and the invalidity of the search warrant ?   plaintiffs cross move for partial summary judgment.

## Factual Background

In April 2000, plaintiffs (who are husband and wife) decided to purchase and renovate a somewhat neglected house in the District of Columbia. Decl. of L. Elkins at ¶ 2 (May 24, 2004), Pls.' Ex. 2; Pls.' Statement of Material Facts at ¶ 1. They met several times with Toye Bello, Acting Zoning Administrator for the District of Columbia, to discuss plans for these renovations. Aff. of  T. Bello at ¶¶ 2-4 (Feb. 17, 2004), Pls.' Ex. 3;

Pls.' Stmt. of Mat. Facts at ¶ 2.  Although they originally hoped to build an addition to their home, Mr. Bello informed Ms. Elkins "that approval of her proposed addition would require Board of Zoning Adjustment approval" and "that the time frame for the approval process if the BZA approval process were to be pursued would be six months to one year – at a minimum." T. Bello Aff. at ¶¶ 5, 6; Pls.' Stmt. of Mat. Facts at ¶ 3.

Ms. Elkins met with Mr. Bello several times to come up with a renovation plan that would "avoid the necessity of a Board of Zoning Adjustment relief application." T. Bello Aff. at ¶ 7; Pls.' Stmt. of Mat. Facts at ¶ 4.  Eventually, Ms. Elkins came to him with a proposal "replacing the existing flat roof with a sloped shed roof on the center and rear portions . . . [that] would fit into the category of a replacement roof/alteration and would not be categorized as an addition or new construction and would not require Board of Zoning Adjustment approval." T. Bello Aff. at ¶ 8; Pls.' Stmt. of Mat. Facts at ¶¶ 5, 6.

Ms. Elkins (who has a Bachelor of Science in architecture) and her husband (who is an architect) prepared drawings showing a sloping (shed) roof in place of several existing flat roofs over the middle and rear portions of the property. L. Elkins Decl. at ¶¶ 1, 2, 5; Pls.' Stmt. of Mat. Facts at ¶ 5.  As Mr. Bello has attested:

9.  I ultimately reviewed the concept drawing which accompanied the permit application which depicted the installation of a shed type roof on the center and rear portions of the property.

10.  The drawings I reviewed with Ms. Elkins were typical of those which customarily accompanied permit applications seeking to obtain concept approval from the Historic Preservation Office or if necessary the Historic Preservation Review Board.

11.  As such drawings go the concept drawing which accompanied the Elkins-Robbins permit application was simple and straight forward.

12.  It was readily apparent that Ms. Elkins was attempting to modify the scope and scale of her proposed construction to meet both zoning and historic preservation requirements.

3

13. In this regard Ms. Elkins was typical of property owners similarly situated who passed through my office on a daily basis.

T. Bello Aff. at ¶¶ 9-13; Pls.' Stmt. of Mat. Facts at ¶¶ 7, 8.

Plaintiffs submitted these drawings, together with existing conditions photographs and the required permit application and fee, to DCRA's Building and Land Regulation Administration in accordance with the ordinances of the District of Columbia. L. Elkins Decl. at ¶ 6; Pls.' Stmt. of Mat. Facts at ¶ 9. T. Luke Young, on behalf of the Historic Preservation Office, "reviewed and approved the plans which depicted a change in the slope of the replacement roof." Aff. of V. Ford at ¶ 10 (Feb. 4, 2004), Pls.' Ex. 4; L. Elkins Decl. at ¶ 5 (stating that the drawings were also approved by Steve Callcott in the Historic Preservation Office); Pls.' Stmt. of Mat. Facts at ¶ 10. Following all of the other reviews required for such permit applications, on April 27, 2001, the District of Columbia issued to plaintiffs building permit No. B436647. L. Elkins Decl. at ¶ 7; Pls.' Stmt. of Mat. Facts at ¶ 11.

As Vincent Ford, then Chief Building Inspector for the District of Columbia, testified in his affidavit: "The approved plans for Permit # B436647 called for the construction of a sloped shed roof in place of an existing flat roof over the middle and rear portions of the property." V. Ford Aff. at ¶ 5; Pls.' Stmt. of Mat. Facts at ¶ 12. By January 2002, plaintiffs had spent over $70,000 from their personal savings to complete construction of the roof. L. Elkins Decl. at ¶ 8; Pls.' Stmt. of Mat. Facts at ¶ 13. That construction was in strict compliance with the building permit as Chief Building Inspector Ford stated: "I visited #20 9th Street N.E. in late January or early February, 2002 and did not observe construction at #20 9th Street N. E. that went beyond the scope

of work depicted in the approved plans and permit applications." V. Ford Aff. at ¶ 12; Pls.' Stmt. of Mat. Facts at ¶ 13.

In January 2002, Defendant David Maloney (who then held the position of Acting Director of the Office of Historic Preservation in the Office of Planning) expressed the desire to see plaintiffs' building permits revoked, and Defendant J. Gregory Love (then Administrator of BLRA) "stated his desire to accommodate Mr. Maloney's request." V. Ford Aff. at ¶¶ 3, 4; Pls.' Stmt. of Mat. Facts at ¶ 14.  Consequently, Chief Building Inspector Ford "was directed by Mr. Love to review the approved plans and building permit applications to determine the accuracy of Mr. Maloney's complaint." V. Ford Aff. at ¶ 8; Pls.' Stmt. of Mat. Facts at ¶ 15.  After a careful review of the plans and inspection of the property, Inspector Ford "thereafter reported to Mr. Love that Mr. Maloney's complaint was incorrect." V. Ford Aff. at ¶¶ 9-13; Pls.' Stmt. of Mat. Facts at ¶ 16.  He also "advised Mr. Maloney and others that the permit applications and plans had been reviewed by and approved by the Office of Historic Preservation and that the construction undertaken by Mr. Robbins and Ms. Elkins complied with the approved plans and permits." V. Ford Aff. at ¶ 16; Pls.' Stmt. of Mat. Facts at ¶ 16.  "In spite of [his] findings, in February 2002, Mr. Love reported that Mr. Maloney continued to pressure BLRA to halt work on the Robbins-Elkins construction project and require them to resubmit their construction to further historic preservation review and approval." V. Ford Aff. at ¶ 14; Pls.' Stmt. of Mat. Facts at ¶ 17.

In an apparent effort to placate Defendant David Maloney, on March 5, 2002, Defendant Denzil Noble (then Deputy Administrator for BLRA) wrote to plaintiffs accusing them of construction beyond that authorized by their permits. Pls.' Ex. 5; Pls.'

Stmt. of Mat. Facts at ¶ 18.  Mr. Noble's letter further stated that "[i]n order to rectify this problem, you are required to file an application for a revised building permit to reflect the work not covered under the permits noted above, and any additional work being proposed." Pls.' Ex. 5; Pls.' Stmt. of Mat. Facts at ¶ 18.  Responding immediately to Mr. Noble's letter, Ms. Elkins contacted Mr. Ford who told her to contact Mr. Bello.  Mr. Bello told her that a permit for removal of part of the second story floor would satisfy Mr. Noble's demand. L. Elkins Decl. at ¶ 10; Pls.' Stmt. of Mat. Facts at ¶ 19.  Ms. Elkins prepared the necessary plans and application and on March 8, 2002 that permit ( No. B440544) was issued. L. Elkins Decl. at ¶¶ 10-11; Pls.' Stmt. of Mat. Facts at ¶ 20.

Meanwhile, one of plaintiffs' neighbors, Robert Kim Stevens, filed suits against the District of Columbia and plaintiffs seeking a declaration that the building permits were invalid for the reasons put forth by Defendant David Maloney. *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. 2002), *Stevens v. Robbins*, No. 02-1604 (D.C. Sup. Ct. 2002); Pls.' Stmt. of Mat. Facts at ¶ 21.  In *Stevens v. Williams*, a hearing on Mr. Stevens' application for a Temporary Restraining Order to stop all work on plaintiffs' home was set for the afternoon of March 19, 2002.[1] Pls.' Stmt. of Mat. Facts at ¶ 22.  The evening before the hearing, the District's lawyers faced a dilemma: while the Historic Preservation Office and Defendant Maloney agreed with the neighbors, "DCRA apparently strongly feels that the permits ARE being followed, and that HPO blessing, to the extent required has been given and its conditions being met." Pls.' Ex. 6; Pls.' Stmt. of Mat. Facts at ¶ 22.

---

[1] Plaintiffs Laura Elkins and John Robbins intervened by oral motion at the Temporary Restraining Order hearing for the *Stevens v. Williams*, No. 02-1952 case.

By the time of the hearing, the District had arrived at the conclusion that Ms.

Elkins and Mr. Robbins were in full compliance with their permits. Pls.' Stmt. of Mat.

Facts at ¶ 23.  Counsel for the District announced to the court:

> Mr. Saindon: . . . I would proffer that the owners of the property are fully in compliance with the permit and the plans that they submitted according to their various permits. So that, essentially, was going to be my position. . . . On a factual basis, they are in full compliance with their building permits.
>
> ***
>
> As I have indicated before, DCRA will testify that the owners of the property are in full compliance with their permits.

Transcript of Proceedings at 11, 16, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct.

March 19, 2002), Pls.' Ex. 7; Pls.' Stmt. of Mat. Facts at ¶ 23.  The court then questioned

Chief Building Inspector Ford:

> The Court: There's nothing, to your knowledge, that is going on out there that is in violation of those permits.
>
> Mr. Ford: That's correct.
>
> ***
>
> [I]n essence, we had a righteous permit, a permit that's correct to go out. Now, if there was a flaw in that process, a flaw in that plan, whether intentional or unintentional, I can't issue or could not issue a Stop Work Order for that because it's not within the Stop Work Order section for me to do that. So in essence, we have, had a good permit. . . .

Transcript of Proceedings at 32-35, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct.

March 19, 2002), Pls.' Ex. 7; Pls.' Stmt. of Mat. Facts at ¶ 23.

Mr. Bello, the Acting Zoning Administrator, confirmed that the original plans

submitted by plaintiffs showed the sloped roof: "In the original set of plans that was filed

and approved by the Historic Preservation Office, it clearly indicated that a flat roof was

going to be changed to a pitch roof and was going higher than what the roof was before."

Transcript of Proceedings at 47, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March

19, 2002), Pls.' Ex. 7; Pls.' Stmt. of Mat. Facts at ¶ 24.  In reliance upon the evidence of

Mr. Ford and Mr. Bello, as well as the representations of District counsel, the court

denied Mr. Stevens a temporary restraining order on the ground that plaintiffs' work was

fully authorized by their permits:

> The Court: I find that – another thing I want to say at the very outset.
> Historic Preservation people have not been left out. This is not a case
> where they have been left out in the cold and somebody has done that,
> taken action without notifying them. Because on several occasions, as Mr.
> Ford told me and indeed on the exhibit shown to me by Mr. Robbins, and
> explained to me the pitch in the roof here on the drawing to scale, was
> signed off. Well, it hasn't been signed off by the Board as such historic,
> the top people of Historic Preservation, but it is on behalf of Historic
> Preservation, signed off. And they've done that on more than one occasion
> and that was important to Mr. Ford's analysis in looking at the case.
>
>
> Still, an open question that's very interesting to me, you could have a case
> just because somebody signed off on it, that you see something that's just
> flat out wrong, whether the city would then just say well, they signed off,
> I'll go along with it because it doesn't, if the zoning has signed off, it
> doesn't violate overall zoning. But I can conceive of a case like that
> coming along and I would hope that the city would always look at these
> things carefully and not just see Historic Preservation with a stamp.
> Because there could be a situation where there could be a mistake made. I
> don't find that in this case, especially this drawing.
>
> ***
>
> So when I put this together, keeping in mind that I'm sitting here in equity,
> I'm supposed to put on the old chancellor's hat of old and balance the
> equities in this case, and the posture this comes to, the fact that zoning has
> approved this, building inspectors have approved this, the city takes the
> position that things are in compliance, they have an interest to make sure
> things aren't done improperly. Gosh knows that they have an interest, they
> do it every day. They really do it every day. And Historic Preservation
> would have a right to do something and they're on notice, apparently, that
> this is going on. They've given two approvals, and there's been contact
> with them. They haven't come and said Judge, we really think things
> shouldn't go forward here today.

Transcript of Proceedings at 59, 60, 64, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct.

March 19, 2002), Pls.' Ex. 7; Pls.' Stmt. of Mat. Facts at ¶ 25.

     In making his ruling, the court was aware that the Historic Preservation Office

held a position different from that put forward by District counsel, and the officials who

issue and enforce building permits (DCRA):

> Mr. Hitchcock [counsel for the neighbor]: . . .  DCRA lifted the Stop Work
> Order, Historic Preservation Division would have preferred to keep it in
> place is my understanding.
>
> The Court:  But they haven't taken any formal position here today.
> Mr. Saindon: No, they haven't.
> Mr. Hitchcock: No.
>
> Mr. Saindon:  And they are aware of the proceeding.

Transcript of Proceedings at 65, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March

19, 2002), Pls. Ex. 7; Pls.' Stmt. of Mat. Facts at ¶ 26.

     Thereafter the *Stevens* cases were resolved in favor of the District and Laura

Elkins and John Robbins by unconditional dismissals with prejudice, to which no one

objected. *See* Pls.' Ex. 8; L. Elkins Decl. at ¶ 14; Pls.' Stmt. of Mat. Facts at ¶ 27.[2]   This

should have been the end of the matter. But Defendant Maloney still would not give up.

     On April 3, 2002, however, Defendant Maloney sent a memorandum to

Defendant Love, stating:  "I hereby request that you initiate a revocation of building

permits B436647 and B440544 for 20 9th Street, NE, in accordance with Section 108.9

of the Construction Code." Pls.' Ex. 9; Pls.' Stmt. of Mat. Facts at ¶ 28.  When this did

not achieve the desired result, "[a] telephone call was received from the Office of the

Mayor of the District of Columbia concerning the 'failure' of BLRA to 'cooperate' with

---

[2] Plaintiffs Laura Elkins and John Robbins intervened as defendants in *Stevens v. Williams*. Mr. Stevens
also dismissed his complaint against Plaintiffs Laura Elkins and John Robbins in *Stevens v. Robbins* with
prejudice. L. Elkins Decl. at ¶ 14.

the Office of Planning's Historic Preservation Office." V. Ford Aff. at ¶ 19; Pls.' Stmt. of Mat. Facts at ¶ 29. Finally, "[i]n the presence of Mr. Maloney, Mr. Brennan and Mr. Noble, at a meeting held a day or two prior to the May 17, 2002 Notice of Violation, Mr. Love instructed [Mr. Ford] to "find a way" to stop work at #20 9th Street, N. E. and force Mr. Robbins and Ms. Elkins to go back to the Office of Historic Preservation for re-approval of their work." V. Ford Aff. at ¶ 20; Pls.' Stmt. of Mat. Facts at ¶ 30. "Mr. Love, still in the presence of Mr. Maloney, Mr. Brennan and Mr. Noble, thereupon instructed [Mr. Ford] to draft a Notice of Violation requiring Mr. Robbins and Ms. Elkins to resubmit their project to the Office of Historic Preservation." V. Ford Aff. at ¶ 23; Pls.' Stmt. of Mat. Facts at ¶ 31.

Mr. Ford's first draft of the Notice of Violation was rejected by Defendants Love and Maloney, and the notice actually sent out was "altered by others." V. Ford Aff. at ¶¶ 24, 28; Pls.' Stmt. of Mat. Facts at ¶ 32. Mr. Ford believed this notice was legally deficient under the D.C. Construction Codes, for "[n]either Mr. Robbins or Ms. Elkins were provided an appeal request form or otherwise, orally or in writing, advised of their right to appeal the Notice of May 17, 2002, nor did I ever refer the Notice to the Office of Compliance." V. Ford Aff. at ¶ 29; Pls.' Stmt. of Mat. Facts at ¶ 33. Mr. Ford was also ordered to issue Stop Work Orders, even though "[he] observed no conditions which could reasonably be considered unsafe or a menace to life or limb," and "[he] observed no conditions which could reasonably require immediate steps to be taken for the protection of the public." V. Ford Aff. at ¶¶ 31, 32; Pls.' Stmt. of Mat. Facts at ¶ 34.

Defendants Maloney and Noble were aware all along that no grounds existed for revocation of plaintiffs' building permit. As acting Zoning Administrator Bello testified by affidavit:

> 16. Early on I advised Denzil Noble and David Maloney that BLRA did not have a problem with the Robbins Elkins permit applications and, that if that the Historic Preservation Office had simply changed its mind about its prior approval of the Elkins Robbins applications because of the public pressure it was receiving, that it should simply approach Ms. Elkins and Mr. Robbins and request them to resubmit their project to Historic Preservation, rather than continuing to seek flaws in the applications or accusing Ms. Elkins and Mr. Robbins of misconduct or fabrication.

T. Bello Aff. at ¶ 16; Pls.' Stmt. of Mat. Facts at ¶ 35.

When Mr. Noble came up with the idea of revoking the permit on the ground that plaintiffs had improperly filled out item 60 (change in volume of the structure), Zoning Administrator Bello stated:

> 18. At that time I informed Mr. Noble and Mr. Ford that line 60 on the application was not pertinent to this project, and that most permit applications routinely have such omissions and errors.
> 19. I informed Mr. Noble and Mr. Ford that line 60 on the permit application was intended to determine the permit fees for the new construction of new buildings.

T. Bello Aff. at ¶¶ 18, 19; Pls.' Stmt. of Mat. Facts at ¶ 36.

In short, plaintiffs' response to item 60 was not a valid ground for a Notice of Violation or revocation of the permit because:

> 20. The applicants response to line 60 of the permit application did not provide any benefit or advantage to the Elkins Robbins applications whatsoever, nor deter from the government's substantive review of the applications and plans.

T. Bello Aff. at ¶ 20; Pls.' Stmt. of Mat. Facts at ¶ 36. Assaulted with at least five groundless Stop Work Orders and other claims of violations, plaintiffs finally sought

declaratory and injunctive relief from Superior Court in December 2002. L. Elkins Decl. at ¶ 18; Pls.' Stmt. of Mat. Facts at ¶ 37.[3]

On March 26, 2003, the District attempted to obtain a search warrant from Superior Court to search plaintiffs' home.  The sole probable cause given was the false claim that plaintiffs' renovations "pose an imminent threat to the health, safety and welfare of the public." Defs.' Ex. 10; Pls.' Stmt. of Mat. Facts at ¶ 38.  Defendants failed, however, to file their application as a miscellaneous case, or to file a return of the warrant (requirements for a valid search warrant under Sup. Ct. R. 204).  Even if the warrant had been valid, it did not authorize any seizure of documents; it authorized only a search for "unlicensed construction work." Defs.' Ex. 10; Pls.' Stmt. of Mat. Facts at ¶ 39.

The next day (March 27, 2003), approximately a dozen District agents, including armed policemen, led by Defendant Toni Williams-Cherry, flashed the invalid search warrant and demanded entry to plaintiffs' home. L. Elkins Decl. at ¶ 22 Pls.' Stmt. of Mat. Facts at ¶ 40.  In the course of a two-hour search, defendants rifled plaintiffs' personal files, opening her boxes, files, and file drawers, and examining her personal papers.  L. Elkins Decl. at ¶¶ 22, 24-26; Pls.' Stmt. of Mat. Facts at ¶ 41.  Defendant Cherry seized and took away with her a three-ring binder that included plaintiffs' contracts, loan documents, receipts, and checking statements, as well as drawings and personal materials that had nothing to do with the construction. L. Elkins Decl. at ¶¶ 25-26; Pls.' Stmt. of Mat. Facts at ¶ 42.  Tellingly, no imminent threat to public health or safety was mentioned or identified by any of these agents of the District. L. Elkins Decl. at ¶ 27; Pls.' Stmt. of Mat. Facts at ¶ 43.

---

[3] The court denied them a Temporary Restraining Order on December 18, 2002, and subsequently dismissed the case without prejudice for lack of jurisdiction and failure to exhaust administrative remedies on March 28, 2004. Pls.' Ex. 10.

The documents seized in this illegal raid, moreover, have turned up as "evidence" cited by defendants as grounds for revoking plaintiffs' building permits. Pls.' Ex. 11 Pls.' Stmt. of Mat. Facts at ¶ 45. Although defendants commenced a revocation proceeding on December 17, 2003, plaintiffs have not yet been afforded a hearing. L. Elkins Decl. at ¶ 28; Pls.' Stmt. of Mat. Facts at ¶ 44. Accordingly, all of plaintiffs' permits remain valid and in effect. *Id*.

### Procedural Background

Plaintiffs filed their Complaint on March 23, 2004. In lieu of an Answer, on April 30, 2004, defendants filed a motion to dismiss, or in the alternative, for summary judgment. The parties have not yet met and conferred nor have they filed a joint status report with the Court as required by Local Rule 16.3(a). There has been no scheduling conference with the Court in this case, nor have the parties exchanged Fed. R. Civ. P. 26 initial disclosures.

**A.** ***Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. 2002); *Stevens v. Robbins*, No. 02-1604 (D.C. Sup. Ct. 2002)**

In March of 2002, the plaintiffs' next-door neighbor, Robert Kim Stevens, sued the District of Columbia and plaintiffs Laura Elkins and John Robbins in two separate cases, challenging the validity of plaintiffs' building permits. Mr. Stevens asked the Superior Court to enjoin plaintiffs from engaging in any further construction under those permits until their project could be reviewed by the Historic Preservation Review Board. Mr. Stevens also sought damages against the plaintiffs on the grounds that the construction was a nuisance. A hearing was held on March 19, 2002 on Mr. Stevens' motion for Temporary Restraining Order in *Stevens v. Williams*, in which District officials Vincent Ford and Toye Bello testified that plaintiffs' building permits were valid

and that their construction was in conformance with the permits. Following the denial of the Temporary Restraining Order, Mr. Stevens subsequently voluntarily dismissed his complaint in *Stevens v. Williams*. Mr. Stevens also dismissed his complaint against Plaintiffs Laura Elkins and John Robbins in *Stevens v. Robbins* with prejudice. L. Elkins Decl. at ¶ 14.

### B. *Robbins v. District of Columbia*, No. 02-10453 (D.C. Sup. Ct.)

On December 17, 2002, plaintiffs filed suit in D.C. Superior Court against the District of Columbia seeking a declaration that their building permits were valid and an injunction to prevent the District from taking any further action that would impede construction in conformance with their permits. Following the District's issuance of a Notice of Proposed Revocation of plaintiffs' building permits on December 17, 2003, the Court dismissed their suit without prejudice on March 26, 2004, for lack of subject matter jurisdiction and failure to exhaust administrative remedies. Pls.' Ex. 10.

### Argument

### Standard of Review

Motions to dismiss are disfavored and will not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C. Cir. 1994). In reviewing defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6), this Court must accept the allegations of plaintiffs' complaint as true. *Croixland Props. Ltd. P'ship. v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999). All reasonable inferences must be drawn in favor of plaintiffs and the court should only dismiss the complaint "'if it is clear that no relief could be granted

14

under any set of facts that could be proved consistent with the allegations.'" *Id.* (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

Despite defendants' urgings to the contrary, under Fed. R. Civ. P. 12(b)(6), a court "does not test whether the plaintiff will prevail on the merits, but instead whether the claimant has properly stated a claim." *Price v. Crestar Sec. Corp.*, 44 F. Supp. 2d 351, 353 (D.D.C. 1999). In a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the "moving party bears a heavy burden of persuasion." *Berg v. First American Bankshares, Inc.*, 599 F. Supp. 500, 502 (D.D.C. 1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46, (1957)). Defendants have not met that burden here.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 579 (D.C. Cir. 1998); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

Summary judgment may not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where more than one plausible inference can be drawn from the undisputed facts, summary judgment is not appropriate. *See United States v. Spicer*, 57 F.3d 1152, 1160 (D.C. Cir. 1995). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact."
*Anderson*, 477 U.S. at 247-48.

Summary judgment is also inappropriate where numerous material facts are in dispute and for which there has been no discovery. *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988) ("[U]nder the Federal Rules of Civil Procedure, when a Rule 12(b)(6) motion to dismiss is converted into a motion for summary judgment,  all parties must be given a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.' Furthermore, it is settled that the term 'reasonable opportunity' includes the opportunity 'to pursue reasonable discovery.'") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (holding summary judgment appropriate only "after adequate time for discovery"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (holding plaintiff must have "a full opportunity to conduct discovery") (other citations omitted)).

I.      **Plaintiffs' Building Permits Are Valid, a Fact That Defendants Are Collaterally and Judicially Estopped From Challenging in This Case.**

A Superior Court lawsuit challenging the validity of plaintiffs' building permits, in which plaintiffs and the District of Columbia were parties, resulted in a final judgment that they were valid.  This final judgment was based primarily on the District's argument and evidence that the permits were valid, and that plaintiffs had not done work in excess of that authorized by the permits.  Under traditional rules of issue preclusion (collateral estoppel) and judicial estoppel, the validity of plaintiffs' permits and the work done are established facts in this case.  Because there are no material facts in dispute on this issue, plaintiffs are therefore entitled to partial summary judgment on this issue.

### A.  Collateral Estoppel

Under the issue preclusion aspect of the *res judicata* doctrine, also known as collateral estoppel, "a final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action." *I.A.M. National Pension Fund v. Industrial Gear Mfg. Co*., 723 F.2d 944, 947 (D.C. Cir. 1983). Collateral estoppel applies if:

> (1) The same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case.
>
> (2) The issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case.
>
> (3) Preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*California Native Plant Society v. Norton,* No. 03-1540, 2004 U.S. Dist. LEXIS 5940 at *1, 10 (D.D.C. Feb. 9, 2004).

> [A] judgment bars relitigation of an issue necessary to the judgment. Furthermore, once an issue is raised and determined, it is the entire issue that is precluded, not just the particular arguments raised in support of it in the first case.

*Id*. at *12-13. *(quoting Yamaha Corp. of America v. United States,* 961 F.2d 245, 254 (D.C. Cir. 1992)).

The primary issue in *Stevens v. Williams* was the validity of plaintiffs' building permits and the lawfulness of their construction. *See* Compl., *Stevens v. Williams,* No. 02-1952 (D.C. Sup. Ct. 2002).  That issue was necessarily and finally determined by Stevens' dismissal with prejudice, following denial of a Temporary Restraining Order. *Davis v. Davis*, 663 A.2d 499, 504 (D.C. 1995) ("[A] party who voluntarily dismisses the action and thereby prevents a previous determination of an issue from becoming

17

embodied in a valid, final judgment on the merits may be estopped from relitigating that issue."); *see also St. Paul Fire & Marine Insurance Co. v. United States*, 4 Cl. Ct. 762, 766-67 (1984) ("A dismissal with prejudice is a full adjudication of the case in favor of the defendant; absent a counterclaim, it is the best possible result a defendant could hope for.") (citing *Smoot v. Fox*, 340 F.2d 301, 303 (6th Cir. 1964) ("Dismissal of an action with prejudice is a complete adjudication of the issues presented by the pleadings. . . . An adjudication in favor of the defendants, by court or jury, can rise no higher than this.") (other citation omitted).

Having convinced Superior Court Judge Bruce S. Mencher that plaintiffs' permits and construction were entirely legal, defendants suffer no unfairness from the requirement that they stick to that position. At the hearing on Mr. Stevens' motion for Temporary Restraining Order, District counsel argued, and Chief Building Inspector Vincent Ford and acting Zoning administrator Toye Bello testified, that plaintiffs' permits were validly issued and that all work done was in compliance with the permits. Transcript of Proceedings at 32-35, 47, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 7.

Mr. Ford also testified in that hearing that the District had no basis for issuing a Stop Work Order against the plaintiffs' construction. Transcript of Proceedings at 34-35, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 7. Based on that testimony, Judge Mencher denied Mr. Stevens' motion for temporary restraining order. Transcript of Proceedings at 64-66, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002) (The Court: ". . . [T]his comes to, the fact that zoning has approved this, building inspectors have approved this, the city takes the position that things are in

compliance . . . . [T]here's been no representation to me, let me put it this way, from the Historic Preservation people today that what has gone on is improper, that they want the permits cancelled, anything like that. . . . So when I look at the four factors in the case, I would be denying the application for Temporary Restraining Order."), Pls.' Ex. 7.  Both cases were dismissed with prejudice. *See* Pls.' Ex. 10.

Contrary to defendants' contention, that plaintiffs and the District were both aligned as defendants in the *Stevens* cases does not alter the collateral estoppel effect of that judgment.  In *Milton S. Kronheim Co. v. District of Columbia*, 91 F.3d 193 (D.C. Cir. 1996), the D.C. Circuit stated that "[o]ffensive collateral estoppel precludes a defendant 'from relitigating identical issues that the defendant litigated and lost against another plaintiff.'" *Id.* at 197 (quoting *Jack Faucett Associates, Inc. v. AT&T Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984)).  In *Ali Baba Co. v. Wilco, Inc.*, 482 A.2d 418, 422 n.7 (D.C. 1984), the D.C. Court of Appeals held that mutuality between the parties in a prior action is no longer required for offensive collateral estoppel to apply in a subsequent action.

### B.  Judicial Estoppel

The doctrine of judicial estoppel precludes a party from arguing one side of an issue in one case and arguing the opposite in a subsequent case. *Porter Novelli v. Bender*, 817 A.2d 185, 188 (D.C. 2003).  "The independent doctrine of judicial estoppel precludes a litigant from playing fast and loose with a court of justice by changing his position according to the vicissitudes of self interest for such conduct is an affront to judicial dignity." *Lofchie v. Washington Square Ltd. P'ship*, 580 A.2d 665, 668 (D.C. 1990) (Schwelb, J., concurring); *see also American Methyl Corp. v. EPA,* 749 F.2d 826, 833 n.44 (D.C. Cir. 1984) (holding judicial estoppel limited "to cases in which a party

prevails on a claim in one court and proceeds in a calculated manner to manipulate a

second court by asserting facts at odds with those advanced before the first court").

"[J]udicial estoppel focuses on the integrity of the judicial process. To the extent that

prior sworn statements are involved, the doctrine upholds the 'public policy which exalts

the sanctity of the oath. The object is to safeguard the administration of justice by placing

a restraint upon the tendency to reckless and false swearing and thereby preserve the

public confidence in the purity and efficiency of judicial proceedings.'" *Konstantinidis v.*

*Chen*, 626 F.2d 933, 935 (D.C. Cir. 1980) (citations omitted).

In the *Stevens* litigation, counsel for the District of Columbia took the position: "I

would proffer that the owners of the property are fully in compliance with the permit and

the plans that they submitted according to their various permits. So that, essentially, was

going to be my position. . . . On a factual basis, they are in full compliance with their

building permits." Transcript of Proceedings at 11, *Stevens v. Williams*, No. 02-1952

(D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 7.

To satisfy himself of the facts, Judge Mencher examined Chief Building Inspector

Ford, a witness offered by the District to support the position announced by counsel:

> The Court: There's nothing, to your knowledge, that is going on out there
> that is in violation of those permits.
> Mr. Ford: That's correct.
>
>                         * * *
>
> The Court:   What was the authority to build to the height that they built
> to?
> Mr. Ford:   A permit that was issued and plans that were submitted
> indicated that there was going to be a change in the height of the building.
> . . . [T]he plan was approved by the Historic Preservation staff person,
> which occurs in many cases. All permit applications do not go before the
> Board. They can be reviewed by staff and approved by staff and the permit
> application can go on. And in this case, this is what happened.

* * *

Mr. Ford:  . . . Also, it was reviewed by the plan reviewers in Department of Consumer and Regulatory Affairs Plan Review Section. They also reviewed it. The review that comes subsequent to Historic Preservation is based on the approval of Historic Preservation.  If Historic Preservation had not approved it, then the plan reviewers would not review it, they would have stopped it right there. But it was reviewed and approved.

* * *

Mr. Ford:  . . . Another permit went out dealing with the exterior of the building, and it was also approved by the same person who approved for the plans sent. So we have two approvals coming from Historic Preservation, two approvals coming from the plan reviewers, meaning the structural plan reviewers from Department of Consumer Regulatory Affairs. So in essence, we had a righteous permit, a permit that's correct to go out. Now, if there was a flaw in that process, a flaw in that plan, whether intentional or unintentional, I can't issue or could not issue a Stop Work Order for that because it's not within the Stop Work Order section for me to do that. So in essence, we have, had a good permit.

* * *

Mr. Ford: . . . [T]he fact is that the plan was reviewed by Historic Preservation.
The Court: Okay.
Mr. Ford: That's our key. They approved it, so we, in essence, approved it.

Transcript of Proceedings at 32-35, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 7.

The District cannot now argue the exact opposite of what it told the Superior Court and claim that plaintiffs' permits are invalid because the "issuance of plaintiffs' building permits was predicated on potentially erroneous, misleading, or incomplete information." Defs.' Mot. to Dismiss at 23-25.  To allow the District of Columbia to make such a claim would allow the District to "'play[] fast and loose with a court of justice by changing his position according to the vicissitudes of self interest,'" which is

specifically what the doctrine of judicial estoppel was intended to prevent. *Porter Novelli v. Bender*, 817 A.2d 185, 188 (D.C. 2003) (citation omitted).

In *Lassiter v. District of Columbia*, 447 A.2d 456 (D.C. 1982), the D.C. Court of Appeals applied the doctrine of judicial estoppel to prevent a party from doing just what the District is attempting to do here — from testifying to an issue in one case, and attempting to repudiate that testimony in a subsequent case. *Id.* at 461 ("Appellant is judicially estopped to proffer new facts, contrary to his own prior testimony . . . . Appellant, by his oath, is locked into assertions of fact conclusively rejected by the juvenile court in adjudicating the prior proceeding, leaving appellant no way to support his otherwise bare allegation . . . .").

## C. Dismissal For Lack of Jurisdiction

Unlike a dismissal with prejudice, which is a final adjudication on the merits, "a dismissal for lack of jurisdiction is not an adjudication on the merits. Defendants therefore cannot establish one of the four requisite elements for *res judicata*." *Roberts v. United States Postal Service*, No. 02-821, 2003 U.S. Dist. LEXIS 19227 at *1, 6-7 (D.D.C. Mar. 21, 2003) (citing Fed. R. Civ. P. 41(b); *Kasap v. Folger Nolan Fleming & Douglas, Inc.,* 166 F.3d 1243, 1248 (D.C. Cir. 1999); *Polsby v. Thompson*, 201 F. Supp.2d 45, 48 (D.D.C. 2002)).

Plaintiffs' declaratory and injunctive relief case against the District was dismissed without prejudice on March 23, 2004, for lack of jurisdiction.  Order, *Robbins v. District of Columbia*, No. 02-10453 (D.C. Sup. Ct. Mar. 23, 2004) ("FURTHER ORDERED, that the Complaint is hereby DISMISSED without prejudice."), Pls.' Ex. 10.

Consequently, defendants may not rely on any order in that case to establish a fact in this case.  Unlike the collateral estoppel arising from the dismissal with prejudice in

the *Stevens* case, discussed in Section I(A), a dismissal without prejudice is not a final

judgment on the merits for purposes of *res judicata. Pipher v. Odell*, 672 A.2d 1092,

1095 (D.C. 1996) ("[A] dismissal of a claim without prejudice does not bar a subsequent

suit of issues arising out of the same cause of action."); *Thoubboron v. Ford Motor Co.*,

624 A.2d 1204, 1210 (D.C. 1993) (holding that "a dismissal without prejudice 'renders

the proceedings a nullity and leaves the parties as if the action had never been brought'")

(citation omitted).  Moreover, an interlocutory order, such as the August 1, 2003 order,

lacks *res judicata* effect and is not subject to the law of the case doctrine, as defendants

contend. Defs.' Mot. to Dismiss at 15; *Langevine v. District of Columbia*, 106 F.3d 1018,

1023 (D.C. Cir. 1997) ("[I]nterlocutory orders are not subject to the law of the case

doctrine and may always be reconsidered prior to a final judgment.").

      Since the *Robbins* case was dismissed without prejudice for lack of subject matter

jurisdiction, this Court is not bound by any ruling made in that case.  The fundamental

difference between the dismissal with prejudice of the *Stevens* cases, and the dismissal

without prejudice of the *Robbins* case, makes the former conclusive on the issue of the

validity of plaintiffs' permits and construction work, and the latter of no binding

significance.

**II.     Plaintiffs' Properly Stated Claim for Relief for Violation of the Due Process
Clause of the Fifth Amendment Should Not Be Dismissed.  Because the
Parties Dispute Material Facts, Summary Judgment Is Inappropriate at This
Time on This Issue.**

      Defendants argue inexplicably that they cannot determine from the plaintiffs'

Complaint what property the District deprived them of, although paragraphs 14 and 15 of

the Complaint plainly state that Defendants Maloney, Williams, Noble, and Love worked

together to deprive plaintiffs of their building permits — their property rights.  In

paragraph 11 of their Complaint, plaintiffs list all nine permits that the defendants sought

to deprive plaintiffs of without due process.  Plaintiffs also list each construction activity

the permits authorized:

      a)  Install a replacement roof and fence;

      b)  Install skylights;

      c)  Install exterior windows and doors;

      d)  Install a concrete slab for floor replacement;

      e)  Install replacement walls;

      f)  Install storage lofts; and

      g)  Install new bath and kitchen facilities.

Compl. at ¶ 11.  The Complaint thus clearly identifies the building permits as the

property of which plaintiffs were deprived.

      Moreover, the Complaint identifies plaintiffs as owners of their home located at

20 9th Street NE, Washington, DC. Compl. at ¶¶ 1, 11.  That home is real property,

protected by the due process clause. *See Washington ex. rel. Seattle Title Trust Co. v.*

*Roberge*, 278 U.S. 116, 121 (1928) ("The right of the trustee to devote its land to any

legitimate use is properly within the protection of the Constitution.");  *Nollan v.*

*California Coastal Comm'n*, 483 U.S. 825, 833 n.2 (1987) ("[T]he right to build on one's

own property?  even though its exercise can be subjected to legitimate permitting

requirements?  cannot remotely be described as a 'governmental benefit.'").  An owner

may build on its land; that is an ordinary element of a property interest. Zoning

classifications are not the measure of the property interest, but are legal restrictions on the

use of property.

Plaintiffs were entitled to a predeprivation hearing before being deprived of their property—their home and their building permits.  In *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), the Supreme Court stated that:

> The right to prior notice and a hearing is central to the Constitution's command of due process. "The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment -- to minimize substantively unfair or mistaken deprivations of property . . . ." We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in "'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'"

*Id*. at 53 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80-82 (1972) (other citation omitted)).

The Supreme Court has described the homeowner's "right to maintain control over his home, and to be free from governmental interference," as "a privacy interest of historic and continuing importance." *Id.* at 53-54; *cf. United States v. Karo,* 468 U.S. 705, 714 (1984) ("At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion . . ."); *Payton v. New York,* 445 U.S. 573, 589 (1980) ("In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home -- a zone that finds its roots in clear and specific constitutional terms . . . ."); *see also Fuentes v. Shevin*, 407 U.S. 67 (1972) (holding that the loss of kitchen appliances and household furniture was significant enough to warrant a predeprivation hearing); *Connecticut v. Doehr,* 501 U.S. 1 (1991) (holding that a state statute authorizing prejudgment attachment of real estate without prior notice or hearing was unconstitutional, in the absence of extraordinary circumstances, even though the attachment did not interfere with the owner's use or possession and did not affect, as a general matter, rentals from existing leaseholds).

As defendants knew, the District of Columbia Construction Codes entitled plaintiffs to a predeprivation hearing before their building permits could be revoked. *See* 12 D.C.M.R. §§ 108.9-108.14 (1999).[4] Defendants' repeated Stop Work Orders and Notice of Violation, without a hearing, are precisely the kinds of deprivation of property prohibited by the Fifth Amendment.  Chief Building Inspector Ford testified to this in the *Stevens* case, *see* Transcript of Proceedings at 34-35, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002) (I . . . could not issue a Stop Work Order for that because it's not within the Stop Work Order section for me to do that."), Pls.' Ex. 7, and Mr. Maloney complained in a memorandum to the Historic Preservation Review Board that "DCRA has indicated to the HPO that suspension of the work now requires a request for revocation of the permit, and not a stop work order." Pls.' Ex. 12.

Although defendants contend that plaintiffs inaccurately filled out their original building permit application, Mr. Bello, acting Zoning Administrator at the time, has attested:  "At that time I informed Mr. Noble and Mr. Ford that line 60 on the application was not pertinent to this project, and that most permit applications routinely have such omissions and errors." T. Bello Aff. at ¶ 18, Pls.' Ex. 3.

Plaintiffs have alleged sufficient facts on their claim that the individual defendants should be held liable for a civil conspiracy to violate plaintiffs' due process rights.  The two essential elements of civil conspiracy are: (1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner; and (2) an overt tortious act in furtherance of the agreement that causes injury. *Hall v. Clinton,* 285 F.3d 74, 82-83 (D.C. Cir. 2002) (citing *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)). As

---

[4] The D.C. Construction Codes were recently revised and recodified in January 2004. The procedures for the revocation of building permits are now found at 12A D.C.M.R. § 105 (2004).

Chief Building Inspector Ford has testified by affidavit, Defendants Noble, Maloney and Love, at a meeting just prior to the issuance of the May 17, 2002 Notice of Violation to plaintiffs, and following a telephone call from Defendant Mayor Williams, instructed Mr. Ford to "'find a way' to stop work at #20 9th Street, N. E. and force Mr. Robbins and Ms. Elkins to go back to the Office of Historic Preservation for re-approval of their work" even though no grounds for stopping work existed. V. Ford Aff. at ¶¶ 19, 20, Pls.' Ex. 4. Plaintiffs have suffered actual damages as a result of defendants' unconstitutional and tortious actions. Compl. at ¶ 28.

The D.C. Circuit, and numerous other courts, have held that building permits are property protected against unlawful deprivation by the due process clause. *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1073 (D.C. Cir. 2003) ("We believe both of these provisions indicate that Clark has a property interest in the continued effect of the five permits. . . . The five preliminary permits are, on their own, authorizations to act - authorizations with which the District could not interfere without affording Clark adequate process."); *Tri-County Industries, Inc. v. District of Columbia*, 104 F.3d 455, 461 (D.C. Cir. 1997) ("The property interest here—the entitlement to continue construction without unfair interference—is substantial; any interruption of construction is likely to be very costly."); *see also* John J. Delaney & Emily J. Vaias, *Recognizing Vested Development Rights as Protected Property in Fifth Amendment Due Process and Takings Claims*, 49 WASH. U.J. URB. & CONTEMP. L. 27, 34-35 (1996) ("A review of the state caselaw on vested rights reveals that a substantial majority of states, thirty in number, expressly or impliedly consider a vested right to be the equivalent of a property interest or right. . . . Therefore, if under applicable state law a landowner

acquires a vested right, and thus a property interest deserving protection, an intervening

regulation or government action that purports to cut-off that right will almost certainly

precipitate a substantive due process claim and arguably a takings claim as well.")

In *Speyer v. Barry*, 588 A.2d 1147 (D.C. 1991), a case brought to prevent the

construction of a treatment center for emotionally disturbed children, the D.C. Court of

Appeals held that "[f]amiliar equitable principles . . . provide some protection to those

who have substantially changed their position in reliance on existing zoning regulations."

*Id*. at 1154 (citing *Steuart Petroleum Co. v. Board of County Commr's*, 347 A.2d 854

(1975); 2 A. RATHKOPF, THE LAW OF ZONING AND PLANNING, ch. 57-6, 57-7 (3d ed.

1972)).  The *Speyer* court recognized the "majority rule" in this area is that a "landowner

will be held to have acquired a vested right to continue the construction of a building or

structure and to initiate and continue to use despite a restriction contained in the

ordinance where, prior to the effective date of the ordinance, in reliance upon a permit

theretofore validly issued, he had, in good faith, made a substantial change of position in

relation to the land, made substantial expenditures, or has incurred substantial

obligations." *Id*. (citing *Steuart*, 347 A.2d at 859); ANNOTATION: ZONING: BUILDING IN

COURSE OF CONSTRUCTION AS ESTABLISHING VALID NONCONFORMING USE OR VESTED

RIGHT TO COMPLETE CONSTRUCTION FOR INTENDED USE, 89 A.L.R.3d 1051, 1058 (1979

& Supp. 1990) (other citation omitted)).

In *Samaritan Inns, Inc. v. District of Columbia,* 114 F.3d 1227 (D.C. Cir. 1997),

the plaintiff, obtained building permits to renovate one of its housing units.  In response

to public opposition to the project, however, the District stopped work under the

plaintiff's building permits without affording the plaintiff either a pre- or post-deprivation

hearing. The court held that there was nothing in the record to suggest that the D.C. officials in purporting to "revoke the permits without the hearing required under District law" could "reasonably have believed that these actions were lawful." *Id.* at 1239.

In *Tri-County Industries, Inc. v. District of Columbia*, the District had issued a building permit to an owner of a warehouse, approving its plans to convert the warehouse into a facility for conducting soil decontamination. 104 F.3d 455 (D.C. Cir. 1997).  Six months later, the District issued a Stop Work Order and suspended work at the site. The Court held that this "suspension violated Tri County's procedural [due process] rights" because the District provided neither a pre- nor post-deprivation hearing for the permit suspension. *Id.* at 457, 460-62.

Having stated a claim for relief in the Complaint, plaintiffs' due process claim should not be dismissed under Fed. R. Civ. P. 12(b)(6).  Because there are material facts in dispute on this issue, plaintiffs ask this Court to allow the parties to engage in some discovery before resolving this issue either through summary judgment or trial. *See* Pls.' Statement of Material Facts in Dispute.

## III.   A Triable Issue of Fact Exists as to Whether Plaintiffs' Fourth Amendment Rights Have Been Violated.

In *District of Columbia v. Little*, 178 F.2d 13, 20 (D.C. Cir. 1949), the D.C. Circuit held "that health officials without a warrant cannot invade a private home to inspect it to see that it is clean and wholesome, or to search for garbage upon a complaint that garbage is there, or to see whether the occupants have failed to avail themselves of the toilet facilities therein."  Rejecting the District's argument that administrative inspections could be conducted without a warrant, the court stated:

> Much of the argument of the District is devoted to establishing the public importance of the health laws.   Assertions are also made of the

29

beneficence and forbearance of health officers.   We may assume both
propositions.     But the constitutional guarantee is not restricted to
unimportant statutes and regulations or to malevolent and arrogant agents.
Even for the most important laws and even for the wisest and most benign
officials, a search warrant must be had.

We emphasize that no matter who the officer is or what his mission, a
government official cannot invade a private home, unless (1) a magistrate
has authorized him to do so or (2) an immediate major crisis in the
performance of duty affords neither time nor opportunity to apply to a
magistrate.   This right of privacy is not conditioned upon the objective, the
prerogative or the stature of the intruding officer.   His uniform, badge,
rank, and the bureau from which he operates are immaterial.     It is
immaterial whether he is motivated by the highest public purpose or by the
lowest personal spite.

\* \* \*

The District lays great stress upon the fact that there was a complaint,
succinct and definite.  But, so far as we know, the existence of a complaint
has never been held to be a basis for dispensing with a search warrant.
Quite the contrary, the fact of a complaint shows (1) that there is an
identifiable informant who could be taken before a magistrate; (2) that the
enforcement officers have no direct or personal knowledge of the alleged
offense; and (3) that in all reasonable probability a search warrant would
be procurable.   These are reasons for getting a warrant, not for failing to
get one.

*Id*. at 17-18.

The Supreme Court has been similarly uncompromising in requiring a warrant

for "administrative" (i.e., non-criminal) search of a private home:

[T]here is no diminution in a person's reasonable expectation of privacy
nor in the protection of the Fourth Amendment simply because the official
conducting the search wears the uniform of a firefighter rather than a
policeman, or because his purpose is to ascertain the cause of a fire rather
than to look for evidence of a crime, or because the fire might have been
started deliberately. Searches for administrative purposes, like searches for
evidence of crime, are encompassed by the Fourth Amendment. And
under that Amendment, "one governing principle, justified by history and
by current experience, has consistently been followed: except in certain
carefully defined classes of cases, a search of private property without
proper consent is 'unreasonable' unless it has been authorized by a valid
search warrant."

*Michigan v. Tyler,* 436 U.S. 499, 506 (1978) (citation omitted); *see also Camera v. Municipal Court of San Francisco*, 387 U.S. 523, 530-31 (1967) ("We may agree that a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime. . . . [W]e cannot agree that the Fourth Amendment interests at stake in these inspection cases are merely 'peripheral.' It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior. For instance, even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security.") (footnote citation omitted).

### A.  There Are No Material Facts in Dispute Regarding the Invalidity of the Search Warrant

D.C. Superior Court Rule of Civil Procedure 204 governs the issuance of administrative search warrants, requiring that "[a]pplications for warrants shall be filed with the Clerk and maintained in the Civil Miscellaneous Docket," and that "[a] copy of the warrant shall be filed with the Court on the next court day after its execution, together with a copy of the return. The warrant and return shall be maintained in the Civil Miscellaneous Docket." D.C. Sup. Ct. R. Civ. P. 204(c), (f).  Failure to comply with these requirements renders the search warrant invalid.

A search of the civil miscellaneous docket of Superior Court revealed no filing of the Noble affidavit, the search warrant or the return following the search.  Decl. of Matthew Haggerty at ¶¶ 2-4 (May 24, 2004), Pls. Ex. 13.  The copies of the invalid

search warrant and affidavit of Mr. Noble provided to this Court bear no civil

miscellaneous number assigned by the clerk of Superior Court, confirming that they were

not filed with the clerk at all.

Defendants submitted a single affidavit, signed by Defendant Noble, in support of

their application for a search warrant.  The sole probable cause alleged in that affidavit

was that "[t]he Director has reason to believe that the Respondents are violating the

Construction Codes, and such violations pose an imminent threat to the health, safety and

welfare of the public." Defs.' Ex. 10. Such violation conjures up false notions of rickety

scaffolding or collapsing ceilings to induce the judge to issue this warrant; yet, nothing in

the slope of plaintiffs' roof or the adequacy of their permit application had anything at all

to do with public health, safety or welfare.  Furthermore, defendants appear to admit the

falsity of Mr. Noble' affidavit.[5]  This false affidavit, upon which the search warrant was

signed by a Superior Court judge, subverted plaintiffs' Fourth Amendment rights.

That a warrant affidavit must set forth particular facts and circumstances

underlying the existence of probable cause so as to allow the magistrate to make an

independent evaluation of the matter is established law. *Franks v. Delaware,* 438 U.S.

154, 165 (1978) (citing *Aguilar v. Texas*, 378 U.S. 108, 114-115 (1964)) (other citations

omitted). The ability of a magistrate to evaluate the existence of probable cause depends

upon the integrity of the affidavit, which should only contain information that is true or

appropriately believed by the affiant to be true. *Harris v. United States*, 834 A.2d 106,

---

[5] "Here, setting aside the alleged falsity of 'an imminent threat to the health, safety, and welfare of the public,' Complaint ¶ 30, there is ample content elsewhere in the affidavit to support a finding of probable cause, especially in light of the lower reasonableness standard applied to administrative searches. *See* Defs' Ex. 10, "Statement of Facts" at 1, 2. The specific, existing violations of plaintiffs were enough, standing alone (and certainly in hindsight), to justify probable cause to issue the administrative search warrant here." Defs.' Mot. to Dismiss at 37.

121 (D.C. 2003). "Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." *Franks v. Delaware*, 438 U.S. 154, 165 (1978) (citations omitted).

Moreover, Mr. Noble (who apparently has never seen plaintiffs' home) fails to allege any personal knowledge of an "imminent threat to public health, safety or welfare." Defs.' Ex. 10. There are certain basic standards for the content of affidavits supporting the issuance of search warrants that must be met. *See* Sup. Ct. R. Civ. P. 204 (2004). In the absence of the minimum required information, no valid basis exists upon which a finding of probable cause can be made. *United States v. Long*, 439 F.2d 628, 629 (D.C. Cir. 1971). In *Schencks v. United States*, 2 F.2d 185 (D.C. Cir. 1924), the court stated the requirements for the affidavit supporting the issuance of a warrant:

> The federal courts have most jealously guarded the rights secured to the people under [the Fourth] amendment, and have uniformly held that its purpose cannot be evaded by the issuance of writs or sworn declarations which would permit the person or persons making them to escape responsibility therefore. A sworn statement that a person is informed and believes, or has reason to believe and does believe, that certain facts exist, is not a positive statement that they do exist, or that they are true, and leaves no one responsible for a search or seizure, in case the information of the affiant or deponent should prove to be correct, or in case there should be no sound basis for his belief. If the peace officer has reason to believe and does believe that a search or seizure ought to be made, he should state in his affidavit the facts which led him to that conclusion, and which were known to him of his own knowledge. If he has no first-hand information as to the material facts, but has been informed by another as to facts or conditions which would justify the issuance of process for search or seizure, the officer should secure the informer's affidavit positively alleging of the latter's own knowledge the existence of such facts or conditions. In the event that the informer is unwilling to make such an affidavit, he should be subpoenaed to appear before the judge or

> commissioner to give testimony as to the truth of the statement made by him to the officer.
>
> * * *
>
> The Constitution is paramount, and the courts will not permit the evasion of the Constitution by validating writs issued on sworn declarations, which literally comply with the terms of the statute, but which fail to establish probable cause, inasmuch as they state the facts on information and belief or state conclusions of fact or of law, instead of positively alleging the material facts.

*Id.* at 186-87 (citations omitted).  Defendant Noble's true motive is revealed in his letter to plaintiffs of March 10, 2003 (less than a week prior to the false affidavit).  After describing complaints from neighbors and District inspectors that plaintiffs were doing work in violation of a District Stop Work Order, and threatening that "the Metropolitan Police Department (MPD) may be instructed to arrest all persons working on the site in violation of the Stop Work Order," Mr. Noble states:

> In view of these incidents, and under the authority of this department pursuant to the D.C. Construction Code, I am officially requesting entry to your property to inspect and verify that no work is taking place in violation of the Stop Work Order.  I have instructed my inspector to conduct his inspection at your premises beginning at 10:00 a.m. on Monday morning, March 17, 2003. Failure to permit entry and inspection at that time will result in the department requesting an administrative search warrant on court order to inspect the premises.

Pls.' Ex. 14.  The letter makes no mention whatever of any threat to public health, safety or welfare.  The dozen or so inspectors who invaded plaintiffs' home on March 27, 2003, likewise found no imminent threat to public health, safety or welfare. L. Elkins Decl. at ¶ 27, Pls.' Ex. 2.  Because there are no material facts in dispute, the Court can conclude as a matter of law the search warrant is invalid.

**B.  Seizure of Papers and Effects**

34

The Fourth Amendment requires that items to be seized pursuant to a warrant must be specifically listed or generally described within that warrant. *Bynum v. United States*, 386 A.2d 684, 687 (D.C. 1978) (citing *Andresen v. Maryland*, 427 U.S. 463, 480 (1976); *Marron v. United States*, 275 U.S. 192, 196 (1927)).

Because defendants were purportedly searching for "unlicensed construction work" posing an "imminent threat," *see* Defs.' Ex. 10, the affidavit did not request and the search warrant did not authorize search or seizure of plaintiffs' personal papers and effects. Thus, even if the search warrant had been completely valid, the search and seizure of plaintiffs' papers and effects was warrantless and unconstitutional.

As Plaintiff Laura Elkins testifies by declaration:

22. . . . on March 27, 2003, at around 10:00 a.m., Toni Williams-Cherry, Juan Scott, and approximately ten other District officials, including armed police (see photograph, attached as Ex. A) and two men who identified themselves as Criminal Investigators Johnson and Squires, pounded on my front door and demanded entry. When I opened the door, they flashed what they stated was a search warrant and demanded entry. They pushed through my front door, demanding that I "get rid of the dog," and fanned out through my house. They did not limit themselves to the area of construction, but searched the entire house taking photographs, looking through drawers and boxes, opening closets and checking under and behind furniture. Ultimately, they searched and photographed every room in our house.

* * *

24. Criminal Investigator Johnson demanded to see my papers and drawings for the construction. I told him that, because of the construction everything was a mess but I would gladly provide the documents if he gave me a list of what he wanted. He replied that I was unlawfully resisting a search warrant, that he was a criminal investigator, and that my resistance gave him the right to search for the papers himself. He and others then began opening boxes, drawers, and file cabinets, pulling out documents. These documents were not in "plain view." *See* photograph, attached as Exs. C and D.

25. I found my notebook, which contained many of the permit and construction records as well as checking statements, financial records, construction loan documents, and probably some correspondence with our

attorney and began to look for the documents they wanted. Toni Williams-Cherry seized the notebook from me and said she would look for herself.

26. The District inspectors gathered around our kitchen table and examined my personal files and records, pulling documents out and shoving them into the notebook that Ms. Williams-Cherry had seized. She left my house carrying the notebook, crammed with papers, plans and documents that had been pulled from my personal files and records. I do not know everything they took that day. The search ended about noon.

L. Elkins Decl. at ¶¶ 22-26. Defendants admit seizure of these documents, stating only that "[t]he evidence seized during the execution of the warrant was returned on April 15, 2003." Defs.' Mot. to Dismiss at 10. Although defendants cite the "plain view" rule, the undisputed evidence is that District inspectors opened and searched plaintiffs' file drawers and boxes to find construction, financial and personal records that were by no means in plain view. L. Elkins Decl. at ¶¶ 24-26.

Defendants used the documents seized to concoct a case for revoking plaintiffs' permits on the ground that they had secret plans (seized on March 27, 2003) to do work not authorized by their permits. Notice of Proposed Revocation, Pls.' Ex. 11.

Thus, even at this early stage in the proceeding, the Court can conclude that there is a triable issue of fact as to whether defendants violated plaintiffs' Fourth Amendment rights by conducting a warrantless search of their home and seizure of their personal papers and effects on March 27, 2003.[6]

---

[6] Plaintiffs have sufficiently alleged that the individual defendants should be held liable for violation of plaintiffs' Fourth Amendment rights as part of a civil conspiracy. *See Hall v. Clinton*, 285 F.3d 74, 82-83 (D.C. Cir. 2002) (holding elements of civil conspiracy are (1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner; and (2) an overt tortious act in furtherance of the agreement that causes injury). Following Defendant Cherry's unsuccessful attempt to unlawfully gain entry to plaintiffs' home and after Defendant Noble unsuccessfully requested entry to inspect plaintiffs' home after receiving complaints regarding the on-going work at their property (even though plaintiffs were in litigation against the District at that time), Defendant Noble signed a false affidavit in support of an administrative search warrant, claiming that plaintiffs' construction posed an "imminent threat to healthy, safety and welfare of the public." L. Elkins Decl. at ¶¶ 19-21; Defs.' Ex. 10. Defendant Cherry executed a

IV.     **The Complaint States Claims for Violation of the Civil Rights Act (42 U.S.C. § 1983).**

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (2004).  The two essential elements of a cause of action under the statute are:  (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Rogers v. Dixon*, No. 91-1537, 1992 U.S. Dist. LEXIS 10163 at *1, 4-5 (D.D.C. July 15, 1992) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds* by *Daniels v. Williams*, 474 U.S. 327 (1986)).   Plaintiffs state claims for violation of their Fifth Amendment due process rights, Compl. at ¶¶ 19-28 (First Claim for Relief), and Fourth Amendment right to be secure in their home, papers and effects Compl. at ¶¶ 29-34 (Second Claim for Relief). Each individual defendant acted as an official of the District of Columbia (under color of its law), and they acted together to deprive plaintiffs of their constitutional rights and D.C. law.

---

search of plaintiffs' home on the basis of the invalid search warrant and seized plaintiffs' personal papers with no authority at all. *Id*. at ¶¶ 22-27; Defs.' Ex. 10.

As former Chief Building Inspector Ford testified by affidavit, under pressure from Defendants Maloney and Noble, and following a telephone call from the office of Defendant Williams, Defendant Love instructed him to "'find a way' to stop work at #20 9th Street, N. E. and force Mr. Robbins and Ms. Elkins to go back to the Office of Historic Preservation for re-approval of their work" even though no grounds for stopping work existed. V. Ford Aff. at ¶ 20, Pls.' Ex. 4. Over a period of years, these defendants actively persecuted plaintiffs through a barrage of notices, orders and administrative proceedings, culminating in the invasion of their home and seizure of their personal papers in a March 27, 2003 raid led by Defendant Cherry. Compl. at ¶¶ 20-25, 30-31.  All of these defendants were active and willing participants in the exercise of their considerable governmental power to force plaintiffs to stop work, regardless of plaintiffs' rights under D.C. law and the United States Constitution.

Defendants' argument that plaintiffs have not sufficiently pleaded a custom or policy of the District of Columbia to deprive them of their civil rights fails for two reasons.  First, plaintiffs are not required to make such a pleading:

> In *Atchinson v. District of Columbia,* 315 U.S. App. D.C. 318, 73 F.3d 418 (D.C. Cir. 1996), the Court of Appeals held that a plaintiff's "failure to allege a specific policy or custom . . . is no longer fatal to a Section 1983 claim when attacked in a motion to dismiss." *Williams v. District of Columbia,* 916 F. Supp. 1, 7 (D.D.C. 1996) (citing *Atchinson*, 73 F.3d at 420). Moreover, a complaint "need not allege all that a plaintiff must eventually prove." *Atchinson,* 73 F.3d at 421-422.

*Jones v. District of Columbia*, 273 F. Supp.2d 61, 64-65 (D.D.C. 2003). Second, plaintiffs have so pleaded. Compl. at ¶¶ 20-27, 30-33.

The District of Columbia has repeatedly been held liable on claims brought under Section 1983 for revoking or suspending building permits without a predeprivation hearing, in violation of the Fifth Amendment. Yet it continues to do so.  The District's

insistence on unconstitutional behavior has been constant in recent years, through several different policy-making officials. *See, e.g., Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1238-39 (D.C. Cir. 1997) (holding District's issuance of invalid Stop Work Order and suspension of plaintiff's building permits without a hearing were unlawful); *Tri-County Industries, Inc. v. District of Columbia*, 104 F.3d 455, 461 (D.C. Cir. 1997) (holding that where District revoked building permit without a hearing, District violated plaintiff's right to procedural due process); *see also Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258, 265 (D.D.C. 1995) (holding that "Plaintiffs' contentions that they had complied with all of the necessary regulatory requirements, that they were legally entitled to a building permit, and that this permit was withheld as a result of improper and politically motivated conduct on the part of the defendants more than satisfies the due process standard" for purposes of denying motion to dismiss).

**V.    Defendants Have Failed to Demonstrate That They Are Entitled to Qualified Immunity.**

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court set forth the scope of the qualified immunity defense: "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 817-18; *see also Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (affirming *Harlow* and refusing to heighten burden plaintiff's burden of proving a constitutional violation).

None of the individual defendants has made a serious effort to demonstrate that his or her actions with respect to plaintiffs were discretionary.  These actions were, in

fact, governed by well-defined law. The D.C. Municipal Regulations established a straightforward process of predeprivation hearing before a building permit could be revoked. 12 D.C.M.R. §§ 108.9-108.14 (1999). The rules of Superior Court set forth the procedure for obtaining an administrative search warrant. D.C. Sup. Ct. R. Civ. P. 204. Had defendants simply followed the law, this suit would not have been filed.

Nor have these defendants attempted to meet the second *Harlow* requirement by showing that a reasonable government official would not know that warrantless administrative searches and seizure of personal papers, or revocation of building permits without predeprivation hearing, are unlawful. To do so, they would have to overcome a significant body of law to the contrary. *See, e.g., District of Columbia v. Little*, 178 F.2d 13 (D.C. Cir. 1949) (holding warrantless administrative searches are unconstitutional); *Michigan v. Tyler,* 436 U.S. 499 (1978) (holding warrantless administrative searches are unconstitutional); *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993) (holding seizure of real property without predeprivation hearing is unconstitutional); *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1238-39 (D.C. Cir. 1997) (holding issuance of invalid Stop Work Order and suspension of building permit without hearing was unlawful); *Tri-County Industries, Inc. v. District of Columbia*, 104 F.3d 455, 461 (D.C. Cir. 1997) (holding summary revocation of building permit without predeprivation hearing was unconstitutional).

In *Walz v. Town of Smithtown*, 46 F.3d 162, 169 (2d Cir. 1995), the U.S. Court of Appeals for the Second Circuit held that the issuance (or denial) of a permit may constitute a ministerial duty for which no qualified immunity is given. The court held that by conditioning the issuance of an excavation permit on the conveyance of land, a

municipal official "was not exercising a discretionary function but simply refusing to perform a ministerial act until a demand with absolutely no basis in legal authority was met." *Id*.  Indeed, the *Walz* court stated that "[r]egardless of any doubts as to whether his conduct violated due process, [the municipal official] could not have believed, as a matter of equal protection or simply of the laws of the town, that he had discretion to deny an excavation permit to the [property owners] as a means of extorting land from them." *Id*.; *see also Bodge v. Zimmerman*, No. 86-6051, 1988 U.S. Dist. LEXIS 10818 at *1, 12 (E.D. Pa. Sept. 23, 1998) (holding that prison officials and officers were not entitled to qualified immunity because "BC-ADM 802 requires that the PRC hearing on administrative custody status 'shall be scheduled . . . not less than 24 hours after notice is given, nor more than 6 days after administrative custody placement, . . . [t]he scheduling of this hearing was therefore not a discretionary action 'influenced by the decisionmaker's experiences, values and emotions'").

In *Samaritan Inns, Inc. v. District of Columbia*, defendants who took similar actions in violation of clearly established law forfeited their right to assert the qualified immunity defense.  In the proceedings below in that case, this Court held that the individually named defendants, Cross and Montgomery, "knew, or should have known, that [its project] met the requirements of District of Columbia law, and that Samaritan Inns was entitled as a matter of right to [undertake the project]." *Samaritan Inns, Inc. v. District of Columbia*, No. 93 CV 2600, 1995 U.S. Dist. LEXIS 9294 at *1, 6 (D.D.C. Jun. 30, 1995).  The Court found that Defendant Montgomery had "studied the relevant Construction Code provisions regarding stop-work orders" and Defendant Cross claimed to "possess[] in-depth knowledge of codes and regulations for 'zoning'" and "admitted

during testimony that he knew about the relevant due process requirements." *Id*. at *36-37.  Further, the Court found that both defendants "knew that the Construction Code imposed a duty on them to inform Samaritan Inns about the specific provision(s) of the Construction Code that it allegedly had violated, and that Cross had 'within three working days of receipt of the appeals form . . . [to] affirm, modify or reverse the previous action or decision.'" *Id*. at *37 (quoting 12 D.C.M.R. § 123.1.2 (1992)).

On the basis of these findings, this Court concluded that the individual defendants were not protected by the a qualified immunity defense: "The evidence convincingly demonstrates that actions of both Cross and Montgomery, in connection with the issuance of a stop-work order, the revocation of the building permits, and the issuance of the Lazarus House citation, violated Samaritan Inns' clearly established rights" and that "a reasonable person who held either of their positions would have known that their actions violated Samaritan Inns' rights." *Id*. at *95. The D.C. Circuit court affirmed, holding "there is nothing in the record to suggest that they could have reasonably believed that the[ir] actions were lawful." *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1238-39 (D.C. Cir. 1997).

Because there are material issues of fact in dispute, summary judgment is not appropriate on these issues.

## VI.   Defendant District of Columbia Has Failed to Demonstrate That It Is Entitled to Summary Judgment on Punitive Damages.

Conceding that the Court could award punitive damages against the District under Section 1983, *see* Defs.' Mot. to Dismiss at 42 (stating that "it is theoretically possible that punitive damages could be awarded against the District . . . ."), defendants argue that punitive damages should not be awarded against the District of Columbia under Section

1983. Defs.' Mot. to Dismiss at 40. The parties agree that courts can award punitive

damages against the District under Section 1983 if there is a showing of "extraordinary

circumstances." *See, e.g., Butera v. District of Columbia*, 235 F.3d 637, 641 (D.C. Cir.

2001) (recognizing there may be "extraordinary circumstances" necessary to award

punitive damages against the District of Columbia for section 1983 and other statutory

claims); *Atchinson v. District of Columbia*, 73 F.3d 418, 425 (D.C. Cir. 1996)

(recognizing "extraordinary circumstances" may warrant punitive damages award against

District for section 1983 claims); *Lucero-Nelson v. WMATA*, 1 F. Supp.2d 1, 11 (D.D.C.

1998) ("[A] showing of 'extraordinary circumstances' might warrant an award of

punitive damages against otherwise immune municipalities.").

In *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227 (D.C. Cir. 1997),

the court awarded punitive damages where the individually named defendants had

engaged in a "course of conduct" that was intentionally aimed at stopping development

and construction work under building permits which were validly issued. *Id.* at 1239. In

*Samaritan*, the individual defendants had refused to rescind a facially invalid SWO for

over three months or to provide the permit holder with a pre-revocation hearing, as a

required under the D.C. Construction Codes when revoking a building permit. *Id.* The

court also found that these individuals had no legitimate reason for issuing a SWO and

revoking the permits, and that the only reason why they did so was to appease community

opposition to the proposed project. *Id.* Thus, the D.C. Circuit upheld the district court's

award of punitive damages, holding that the individual defendants had acted with

"reckless and callous disregard" and that punitive damages were appropriate. *Id.*

At a minimum, the Court should not rule in defendants' favor on this issue until plaintiffs have been afforded some discovery in this case. In *Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258 (D.D.C. 1995), a company seeking to construct and operate steam and cogeneration plant on an university campus sued the District of Columbia for compensatory and punitive damages under Section 1983, alleging a "concerted effort to improperly prevent cogenerators from building and operating facility." *Id.* at 260. The court denied the District's motion to dismiss the punitive damages claim because there had "not been sufficient discovery yet to determine whether the type of 'extraordinary circumstances' which might support a punitive damages award exist[ed] in [that] case," and resolution of the issue of punitive damages on a motion to dismiss "would be premature." *Id*. at 265 n.6.

## Conclusion

For all of these reasons, plaintiffs ask this Court to deny the defendants' motion to dismiss and to grant plaintiffs' cross-motion for partial summary judgment on the validity of the building permits and the invalidity of the search warrant.

Respectfully submitted,

/s/

_____
Roger J. Marzulla, D.C. Bar No. 394907
Nancie G. Marzulla, D.C. Bar No. 400985
MARZULLA & MARZULLA
1350 Connecticut Avenue, NW
Suite 410
Washington, DC  20036
(202) 822-6760
(202) 822-6774 (facsimile)

May 24, 2004                                    Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
LAURA ELKINS, *et al.*,                             )
                                                    )
                        Plaintiffs,                 )
                                                    )
            v.                                      )        Civil Action No. 04-0480 (RMC)
                                                    )
DISTRICT OF COLUMBIA,  *et al.*,                    )
                                                    )
                        Defendants.                 )
_____)

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

1. In April 2000, plaintiffs (who are husband and wife) decided to purchase and renovate a somewhat neglected house in the District of Columbia. Decl. of L. Elkins at ¶ 2 (May 24, 2004), Pls.' Ex. 2.

2. During 2000 and 2001, plaintiffs met several times with Toye Bello, Chief of the Zoning Review Branch, and then Acting Zoning Administrator for Department of Consumer and Regulatory Affairs (DCRA) for the District of Columbia, to discuss plans for these renovations. Aff. of  T. Bello at ¶¶ 2-4 (Feb. 17, 2004), Pls.' Ex. 3.

3. Although plaintiffs originally hoped to build an addition to their home, Mr. Bello informed Ms. Elkins "that approval of her proposed addition would require Board of Zoning Adjustment approval" and "that the time frame for the approval process if the BZA approval process were to be pursued would be six months to one year – at a minimum." T. Bello Aff. at ¶¶ 5, 6; L. Elkins Decl. at ¶ 4.

4. "Thereafter Ms. Elkins returned to [Mr. Bello] several times to raise, and discuss with [him], concepts and ideas that would avoid the necessity of a Board of Zoning Adjustment relief application." T. Bello Aff. at ¶ 7.

5. Ms. Elkins (who has a Bachelor of Science in Architecture) prepared conceptual design drawings showing a sloped shed roof in place of several existing flat roofs over the middle and rear portions of the property, and submitted this design to Mr. Bello and Steve Calcott, in the Historic Preservation Office for review.  Both Mr. Bello and Mr. Calcott approved the design. L. Elkins Decl. at ¶¶ 1, 5.

6. Mr. Bello "confirmed to Ms. Elkins that replacing the existing flat roof with a sloped shed roof on the center and rear portions of # 20 9th Street, N.E. would fit into the category of a replacement roof/alteration and would not be categorized as an addition or new construction and would not require Board of Zoning Adjustment approval." T. Bello Aff. at ¶ 8; L. Elkins Decl. at ¶ 5.

7. Mr. Bello reviewed these conceptual design drawings, "which depicted the installation of a shed type roof on the center and rear portions of the property."  The drawings were "typical of those which customarily accompany[] permit applications seeking to obtain concept approval from the Historic Preservation Office or if necessary the Historic Preservation Review Board." "As such drawings go the concept drawing which accompanied the Elkins-Robbins permit application was simple and straight forward." T. Bello Aff. at ¶ 9-11.

8. "It was readily apparent that Ms. Elkins was attempting to modify the scope and scale of her proposed construction to meet both zoning and historic preservation requirements." T. Bello Aff. at ¶  12.

9. In March of 2001, plaintiffs submitted these plans together with the required permit application and fee to DCRA's Building and Land Regulation Administration, in accordance with the ordinances of the District of Columbia. L. Elkins Decl. at ¶ 6; see also Defs.' Ex. 1.

10. T. Luke Young, on behalf of the Historic Preservation Office, "reviewed and approved the plans which depicted a change in the slope of the replacement roof." Aff. of V. Ford at ¶ 10 (Feb. 4, 2004), Pls.' Ex. 4.

11. Following all of the reviews required for such permit applications, on April 27, 2001, the District of Columbia issued to plaintiffs building permit No. B436647, and they commenced replacement of the roof approximately six months later. L. Elkins Decl. at ¶ 8.

12. "The approved plans for Permit # B436647 called for the construction of a sloped shed roof in place of an existing flat roof over the middle and rear portions of the property." V. Ford Aff. at ¶ 5.

13. By January 2002, plaintiffs had completed construction of the roof at a cost of over $70,000, L. Elkins Decl. at ¶ 8, and construction did not go "beyond the scope of work depicted in the approved plans and permit applications." V. Ford Aff. at ¶ 12

14. In January 2002, Defendant David Maloney (who then held the position of Acting Director of the Office of Historic Preservation in the Office of Planning) expressed the desire to see plaintiffs' building permits revoked, and Defendant J. Gregory Love (then Administrator of Building and Land Regulation Administration (BLRA)) "stated his desire to accommodate Mr. Maloney's request."  V. Ford Aff. at ¶¶ 3, 4.

15. Consequently, Chief Building Inspector Vincent Ford "was directed by Mr. Love to review the approved plans and building permit applications to determine the accuracy of Mr. Maloney's complaint." V. Ford Aff. at ¶ 8.

16. After a careful review of the plans and inspection of the property, Inspector Ford "thereafter reported to Mr. Love that Mr. Maloney's complaint was incorrect." V. Ford Aff. at ¶¶ 9-13. Mr. Ford also "advised Mr. Maloney and others that the permit applications and plans had been reviewed by and approved by the Office of Historic Preservation and that the construction undertaken by Mr. Robbins and Ms. Elkins complied with the approved plans and permits." V. Ford Aff. at ¶ 16.

17. " In spite of [Mr. Ford's] findings, in February 2002, Mr. Love reported that Mr. Maloney continued to pressure BLRA to halt work on the Robbins-Elkins construction project and [to] require them to resubmit their construction to further historic preservation review and approval." V. Ford Aff. at ¶ 14.

18. In an evident effort to placate Defendant David Maloney, on March 5, 2002, Defendant Denzil Noble  (then Deputy Administrator for BLRA) wrote to plaintiffs, stating that plaintiffs had done work beyond that authorized by their permits.  Mr. Noble's letter further stated that "[i]n order to rectify this problem, you are required to file an application for a revised building permit to reflect the work not covered under the permits noted above, and any additional work being proposed." Pls.' Ex. 5.

19. Responding immediately to Mr. Noble's concerns, Ms. Elkins contacted Mr. Ford, who told her to contact Mr. Bello. Mr. Bello told Ms. Elkins that a permit for a removal of part of the second story floor would satisfy Mr. Noble's demand. L. Elkins Decl. at ¶ 10.

4

20. Ms. Elkins prepared the necessary plans and application for constructing a mezzanine above the kitchen and on March 8, 2002, the District issued plaintiffs an amended permit (#B440544), thereafter, the March 5, 2002, stop work order was lifted. L. Elkins Decl. at ¶¶ 10, 11.

21. Meanwhile, one of plaintiffs' neighbors, Mr. Stevens, filed suits against the District of Columbia and plaintiffs seeking a declaration that the building permits were invalid for the reasons put forth by Defendant David Maloney. L. Elkins Decl. at ¶ 12; Defs.' Statement of Material Facts ¶ 6; *see Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. 2002); *Stevens v. Robbins*, No. 02-1604 (D.C. Sup. Ct. 2002).

22. A hearing on Mr. Stevens' application for a Temporary Restraining Order to stop all work on plaintiffs' home was set for the afternoon of March 19, 2002.  The evening before the hearing, the District's lawyers faced a dilemma: while the Historic Preservation Office and Defendant Maloney agreed with the neighbors, "DCRA apparently strongly feels that the permits ARE being followed, and that HPO blessing, to the extent required has been given and its conditions being met." Pls.' Ex. 12.

23. By the time of the March 19, 2002 hearing, the District had concluded that Ms. Elkins and Mr. Robbins were in full compliance with their permits.[1] Counsel for the District, Mr. Saindon, represented to the court that plaintiffs were "fully in compliance with the permit and the plans that they submitted according to their various permits." Transcript of Proceedings at 11, 15-16, 32-35 *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 7.  In support of its position, the District of Columbia

---

[1] Plaintiffs Laura Elkins and John Robbins intervened by oral motion of counsel at the Temporary Restraining Order hearing for the *Stevens v. Williams*, No. 02-1952 case.

offered the testimony of Vincent Ford, Chief Building Inspector, and Toye Bello, Acting

Zoning Administrator.

24. At the hearing, in response to questions from the court, Mr. Bello, the Acting

Zoning Administrator, confirmed that the original plans submitted by plaintiffs showed

the sloped roof: "In the original set of plans that was filed and approved by the Historic

Preservation Office, it clearly indicated that a flat roof was going to be changed to a pitch

roof and was going higher than what the roof was before." Transcript of Proceedings at

46, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 1.  In

response to the court's questions, Chief Building Inspector Ford testified that there was

nothing going on at plaintiffs' home that was in violation of their building permits.

Transcript of Proceedings at 32, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March

19, 2002) ("The Court: There's nothing, to your knowledge, that is going on out there

that is in violation of those permits. Mr. Ford: That's correct."), Pls.' Ex. 7.

25. In reliance upon the evidence of Mr. Ford and Mr. Bello, as

well as the representations of District counsel Saindon, the court denied Mr. Stevens'

application for a Temporary Restraining Order on the ground that plaintiffs' work was

fully authorized by their permits. Transcript of Proceedings at 59, 64, *Stevens v. Williams*,

No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 7.

26. In making his ruling, the court was aware that the Historic Preservation Office

held a position different from that put forward by District counsel, and the officials who

issue and enforce building permits (DCRA). Transcript of Proceedings at 65, *Stevens v.*

*Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls. Ex. 7.

27. Thereafter, final judgment in the *Stevens* case was entered in favor of the District of Columbia.  Likewise, Mr. Stevens dismissed with prejudice his case against Laura Elkins and John Robbins. Pls.' Ex. 8; L. Elkins Decl. at ¶ 14.

28. Meanwhile, on April 3, 2002, Defendant Maloney sent a memorandum to Defendant Love stating:  "I hereby request that you initiate a revocation of building permits B436647 and B440544 for 20 9th Street, NE, in accordance with Section 108.9 of the Construction Code." Pls.' Ex. 9.

29.  Thereafter, BLRA received a telephone call from the Office of the Mayor of the District of Columbia, Defendant Tony Williams, concerning the failure of BLRA to cooperate with Defendant Maloney's request to initiate proceedings to revoke plaintiffs' permits.   V. Ford Aff. at ¶ 19.

30. As a result, "In the presence of Mr. Maloney, Mr. Brennan and Mr. Noble, at a meeting held a day or two prior to defendants' issuance of the May 17, 2002 Notice of Violation, Mr. Love instructed [Mr. Ford] to 'find a way' to stop work at #20 9th Street, N. E. and force Mr. Robbins and Ms. Elkins to go back to the Office of Historic Preservation for re-approval of their work." V. Ford Aff. at ¶ 20.

31. "Mr. Love, still in the presence of Mr. Maloney, Mr. Brennan and Mr. Noble, thereupon instructed [Mr. Ford] to draft a Notice of Violation requiring Mr. Robbins and Ms. Elkins to resubmit their project to the Office of Historic Preservation."  V. Ford Aff. at ¶ 23.

32. Mr. Ford's "first draft of the Notice of Violation was determined to be unacceptable [by Defendants Love and Maloney] because it did not require Mr. Robbins

and Ms. Elkins to complete a [new] building permit application." "The Notice dated May

17, 2002 was altered by others." V. Ford Aff. at ¶¶ 24, 28.

33. That notice was legally deficient under the D.C. Construction Codes, for

"[n]either Mr. Robbins or Ms. Elkins were provided an appeal request form or otherwise,

orally or in writing, advised of their right to appeal the Notice of May 17, 2002, nor did

[Mr. Ford] ever refer the Notice to the Office of Compliance." V. Ford Aff. at ¶ 29.

34. Mr. Ford was also ordered to issue stop work orders, even though "[he]

observed no conditions which could reasonably be considered unsafe or a menace to life

or limb," and "[he] observed no conditions which could reasonably require immediate

steps to be taken for the protection of the public." V. Ford Aff. at ¶¶ 30, 31.

35. Defendants Maloney and Noble were aware all along that no grounds existed

for revocation of plaintiffs' building permit or the stop work orders. In fact, when

Defendant Noble came up with the idea of revoking the permit on the ground that

plaintiffs had improperly filled out item 60 (change in volume of the structure), which is

not applicable to alterations such as plaintiffs', Acting Zoning Administrator Bello

"informed Mr. Noble and Mr. Ford that line 60 on the application was not pertinent to

this project, and that most permit applications routinely have such omissions and errors,"

and "that line 60 on the permit application was intended to determine the permit fees for

the construction of new buildings." T. Bello Aff. at ¶¶ 16, 18, 19.

36. Mr. Bello also stated that plaintiffs' response to item 60 could not be a ground

for a Notice of Violation or revocation of the permit because "line 60 of the permit

application did not provide any benefit or advantage to the Elkins Robbins applications

whatsoever, nor deter from the government's substantive review of the applications and plans." T. Bello Aff. at ¶¶ 20.

37.   Assaulted with repeated groundless stop work orders and claims of violations, plaintiffs finally sought declaratory and injunctive relief from the Superior Court of the District of Columbia.   L. Elkins Decl. at ¶ 18.  That suit was, however, dismissed for lack of subject matter jurisdiction and failure to exhaust administrative remedies.  Pls.' Ex. 8.

38.  On March 26, 2003, the District attempted to obtain a search warrant from Superior Court to search plaintiffs' home.  The sole probable cause given was the completely false claim that plaintiffs' renovations "pose an imminent threat to the health, safety and welfare of the public." Defs.' Ex. 10.

39. The purported search warrant was invalid because defendants failed to comply with Rule 204 of the District of Columbia Superior Court Rules of Civil Procedure, under which the warrant was sought.  Defendants did not file their warrant application with the Clerk of Superior Court as a miscellaneous case, nor did they file a return of the warrant within 24 hours of execution.  Decl. of Matthew Haggerty at ¶¶ 1-4 (May 24, 2004); *see also* Sup. Ct. R. Civ. P. 204 (2004). The purported warrant was limited to a search for "illegal construction," and it did not authorize any seizure.  Defs.' Ex. 10.

40. On March 27, 2003, approximately a dozen District agents, including armed policemen, led by Defendant Toni Williams-Cherry, flashed the invalid search warrant and demanded entry to plaintiffs' home.  L. Elkins Decl. at ¶ 22.

41. In the course of a two-hour search of plaintiffs' home, defendants searched every room and rifled plaintiffs' personal files, opening their boxes, files, and file drawers, and examining all manner of their personal papers.  L. Elkins Decl. at ¶¶ 24-27.

42. Defendant Cherry seized and took away with her a three-ring binder which contained plaintiffs' contracts, loan applications, receipts, checking statements, drawings, and other documents, some of which had nothing to do with construction. L. Elkins Decl. at ¶ 25.

43. At no time has any agent of the District of Columbia, including defendants in this case, ever identified any condition at plaintiffs' home that might reasonably be considered an imminent threat to public health or safety. L. Elkins Decl. at ¶ 27.

44. Although defendant commenced a proceeding for revoking plaintiffs' building permits on December 17, 2003, plaintiffs have never been afforded a hearing on the matter, and their permits have not been revoked. L. Elkins Decl. at ¶ 28.

45. The documents seized in the March 27, 2003 raid, however, have turned up as "evidence" cited by defendant as grounds for revoking plaintiffs' building permits. Pls.' Ex. 11.

Respectfully submitted,

/s/

_____
Roger J. Marzulla, D.C. Bar No. 394907
Nancie G. Marzulla, D.C. Bar No. 400985
MARZULLA & MARZULLA
1350 Connecticut Avenue, NW
Suite 410
Washington, DC  20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: May 24, 2004                              Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
LAURA ELKINS, *et al.*,                          )
                                                )
                    Plaintiffs,                  )
                                                )
            v.                                   )        Civil Action No. 04-0480 (RMC)
                                                )
DISTRICT OF COLUMBIA,  *et al.*,                 )
                                                )
                    Defendants.                  )
_____)

**PLAINTIFFS' STATEMENT OF DISPUTED FACTS
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR
<u>IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs object and respond to defendants' statement of material facts as follows (*see*

Local Rule 7.1(h) and Local Rule 56.1 of the Rules of this Court):

1.  Plaintiffs Laura Elkins and John Robbins ("plaintiffs" or "owners") own the building

and property at 20 9th Street, N.E., in the long-established Capitol Hill historic district ("the

property"). Complaint ¶ 1.

**Plaintiffs' Response:**

Not disputed.

2.   In March of 2001, plaintiffs applied to DCRA for a building permit for, *inter alia*, a

"Replacement roof." Defendants' Exhibit to their Memorandum of Points and Authorities in

Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment

("DEx.") 1. The application indicated "no change" in the proposed number of stories of the

building, *id*. at box 17, "no change" in the proposed gross floor area of the building, *id*. at box

45, and "no change" in the volume of the new building or addition, *id*. at box 60. *See* DEx. 2 at 169.

**Plaintiffs' Response:**

Disputed in part.  Plaintiffs did submit such an application following extensive discussions with the Acting Zoning Administrator for Department of Consumer and Regulatory Affairs (DCRA) for the District of Columbia, Toye Bello, who confirmed that a sloping roof design was permissible under existing zoning.  T. Bello Aff. at ¶ 8, Pls.' Ex. 3; L. Elkins Decl. at ¶¶3-7, Pls.' Ex.2.  Plaintiffs also agree that the application reflected no change in the number of stories (two) in the structure, as stated in item 14 of the application. Defs.' Ex. 1.  Since item 60 applied only to new buildings or additions, however, and was used only to determine fees charged by the District, it was not part of plaintiffs' application and played no role in the District's issuance of their building permit.  T. Bello Aff. at ¶¶ 16, 18, 19. Moreover, their drawings, which were part of the application, clearly showed the sloped roof that plaintiffs planned to construct.  Transcript of Proceedings at 46, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002), Pls.' Ex. 7.

3.  DCRA granted building permit no. B436647 to plaintiffs on April 27, 2001, for "Replacement Roof. Street Elevation: Replacement Fence. Alley Elevation: Install Garage Doors, Etc." The owners began constructing a second floor addition on top of the existing structure, raising one side of the previously flat roof by ten and a half feet. Declaration of David Maloney ("Maloney Decl.") (DEx. 4), dated January 2, 2003, at ¶ 7.

**Plaintiffs' Response:**

Disputed in part.  Plaintiffs agree with the first sentence.  They, however, deny that the

sloped roof storage loft is a "second story" under the D.C. Code. *See* T. Bello Aff. at ¶ 22. According to Mr. Bello, the official charged with responsibility for interpreting the zoning code, a storage loft is not a second story. *See* T. Bello Aff. at ¶ 22. Mr. Maloney, a historic preservation official, has no authority and no responsibility with respect to this aspect of zoning law.

4.   On January 17, 2002, a Stop Work Order ("SWO") was issued by DCRA on the property, for construction exceeding the scope of the permit. HPO staff met with the owner(s) on January 18, and February 28, 2002, to request that the owners submit the project for review before the HPRB. Maloney Decl. ¶ 9.

**Plaintiffs' Response:**

Disputed. Plaintiffs dispute that a valid stop work order was issued by DCRA on January 17, 2002. The alleged SWO failed to "contain a description of the right to appeal the order," and to "state . . . the specific section or sections of the Codes violated." 12 D.C.M.R. § 117.1 (1999) ("The stop work order shall be in writing, in a form prescribed by the code official, containing a description of the right to appeal the order . . . . The stop work order shall state the address of the property and the specific section or sections of the Codes violated. . . . No stop work order may be issued nor considered valid unless it contains all the above information, the name and the telephone number of the official empowered to review the order, and the signature of the issuing official.").[1]   The only telephone number given was that of a historic preservation officer, Defendant Toni Cherry, who has no authority to issue or revoke a stop work order. Pls. Ex. 16; *see also* Memo from K. Edwards, General Counsel, DCRA to Denzil Noble, BLRA

---

[1] The D.C. Construction Codes were recently revised and recodified in January 2004. This provision is now found at 12A D.C.M.R. § 114A (2004).

Administrator (July 31, 2003) (instructing Noble to destroy all stop work orders not containing this information), Pls. Ex. 18.

5. By letter dated March 5, 2002, DCRA directed the owners to file a new building permit application reflecting the actual scope of work being done at the property. Another SWO was issued on March 5, 2002 for working outside the scope of the permits.

**Plaintiffs' Response:**

Disputed. The March 5, 2002 letter from Denzil Noble, Deputy Administrator for the Building and Land Regulation Administration, notified plaintiffs that "[i]n order to rectify this problem, you are required to file an application for a revised building permit to reflect the work not covered under the permits noted above, and any additional work being proposed." Pls.' Ex. 5. Moreover, the alleged stop work order did not comply with 12 D.C.M.R. § 117.1 (1999), in that it did not contain "a description of the right to appeal the order," or "the specific section of the Codes violated," thus it was not valid. Pls.' Ex. 17. On March 8, 2002, DCRA issued plaintiffs a revised building permit (an amendment to the original permit granted for the sloped roof, permit No. B436647) to remove flooring above the kitchen, converting the area to a storage loft not to exceed one-third of the floor below, and to provide a storage loft above the studio not to exceed one-third of the floor below. *See* Permit No. B443341, Pls.' Ex. 15; *see also* Transcript of Proceedings at 46, *Stevens v. Williams*, No. 02-1952 (D.C. Sup. Ct. March 19, 2002) (testimony of T. Bello) ("The original permit clearly shows that there was going to be a change in roof pitch on the side of Mr. Steven's property. The latest permit is to amend what would have created a nonconforming for zoning purposes of a second floor addition. What was allowed was a change in roof pitch and not a story addition above the floor below the kitchen."), Pls.' Ex. 7. On the basis of the March 8, 2002 permit, DCRA also lifted the March 5, 2002 SWO. *See*

-4-

Historic Preservation Review Board Staff Report and Recommendation at 2 (Mar. 28, 2002), Pls.' Ex. 12.

6. On or about Mar. 18, 2002, an adjacent property owner, Robert Kim Stevens, sued the District alleging, *inter alia*, that the District violated D.C. Law 2-144 by not properly processing the proposed construction permit for historic preservation purposes. *Stevens v. District of Columbia*, No. 02-1952 (Super. Ct.). Stevens also sought emergency injunctive relief to enjoin the District from allowing any demolition, alteration, or construction on the property until the project was reviewed by the Historic Preservation Review Board.

**Plaintiffs' Response:**

Not disputed. This case was finally resolved in favor of defendants when Mr. Stevens dismissed it with prejudice. Pls.' Ex. 8.

7. The District issued a Notice of Violation ("NOV") on May 17, 2002, directing the plaintiffs to submit new plans and another building permit application to the HPRB which reflected the actual scope of the work done at the property.

**Plaintiffs' Response:**

Disputed. This Notice of Violation, through which defendants attempted to revoke plaintiffs' building permits without a hearing by requiring them to file a new application, was not valid under the D.C. regulations. 12 D.C.M.R. § 117.1 (1999). Moreover, the reason cited (item 60 of the application) applies only to new buildings and additions, not to alterations authorized by these permits. T. Bello Aff. at ¶¶ 19, 20.

8. The property was placed on the agenda for the September 26, 2002, meeting of the HPRB, at which time the owners, represented by counsel, testified. DEx. 2 at 153–221.

**Plaintiffs' Response:**

Not disputed.  Plaintiffs add that at that time HPRB had no jurisdiction to do anything; this was simply a discussion of the issues, apparently initiated by Defendant Maloney.  L. Elkins Decl. at ¶ 17.

9.   HPO staff indicated that the owners' original plans and application "just simply doesn't represent the extent of the project in an adequate fashion." DEx. 2 at 172. HPO staff recommended certain modifications to the existing structure. *Id*. at 176, 180. HPO staff recommended that the owners file a revised permit application, as indicated in the May 17, 2002, Notice of Violation. DEx. 2 at 181.

**Plaintiffs' Response:**

Not disputed.  Plaintiffs note, however, that "HPO staff" here is Defendant Maloney, who continued to object to plaintiffs' renovations despite the fact that they were in full compliance with District zoning and construction code requirements, and the plans were typical of those ordinarily submitted for such renovations.  T. Bello Aff. at ¶ 10; V. Ford Aff. at ¶ 32.

10.  Plaintiff Robbins, at this HPRB meeting, admitted that the owners replaced the existing roof "at a slope," DEx. 2 at 187, and that they did not indicate on the application that they would be adding any volume to the existing building.  *Id*. at 190. He also admitted that the owners did not submit a complete set of plans at the time they applied for the initial building permit. DEx. 2 at 200–201. The HPRB Chairman directed the owners to submit a complete application and plans for the construction that had occurred on the property, and to work with HPO staff. DEx. 2 at 212–15.

**Plaintiffs' Response:**

Disputed.  In an attempt to resolve the concerns of Mr. Maloney, who appeared to be the moving force in the District's reversal of position, plaintiffs appeared at a Historic Preservation

Review Board hearing on September 26, 2002. The purpose of this meeting was simply informational, since at this time HPRB had no jurisdiction over plaintiffs' project.  At the hearing John Robbins answered questions and tried to explain the unreasonableness of requiring plaintiffs to tear down the roof and other construction that had been done in compliance with District codes.  Regrettably, the Board was not satisfied, and requested (because it could not require) plaintiffs to begin the building permit process all over again.  Plaintiffs did submit to the Board copies of plans and other documents they requested, but apparently to no avail. L. Elkins Decl. at ¶ 17; *see also* Pls.' Statement of Facts at  ¶¶ 5-12, 18-21.

11.  Plaintiffs have not submitted the requested permit application to HPRB. Maloney Decl. ¶ 9.

**Plaintiffs' Response:**

Not disputed.  Since plaintiffs already have a building permit for this alteration, no reason exists to submit a new application for the same work.

12. On November 13, 2002, a SWO was issued by DCRA based on the owners' failure to comply with the May 17, 2002, NOV. The owners appealed the November 13, 2002, SWO by letter dated November 22, 2002.

**Plaintiffs' Response:**

Disputed. The purported stop work order was not valid because it did not comply with 12 D.C.M.R. § 117.1 (1999) and because it was based on an invalid NOV.

13. On December 17, 2002, Plaintiffs filed their complaint and motions for injunctive relief in *Robbins v. District of Columbia*, No. 02-10453 (D.C. Super. Ct.). The complaint sought a declaratory judgment that plaintiffs' building permits were valid and injunctive relief to prevent the District from taking further administrative action regarding the property.

**Plaintiffs' Response:**

Not disputed.  This suit was subsequently "dismissed without prejudice" for lack of subject matter jurisdiction and failure to exhaust administrative remedies. Pls.' Ex. 10.

14.  After the hearing, the Honorable Bruce S. Mencher (again sitting as Judge-in-Chambers) denied plaintiffs' application for a TRO. DEx. 9 at 47–51.

**Plaintiffs' Response:**

Not disputed.

15. By letter dated December 23, 2002, DCRA denied plaintiffs' appeal of the November 13, 2002, SWO, and informed them of their right to appeal the denial to the Board of Appeals and Review ("BAR"). Plaintiffs subsequently appealed the November 13, 2002, SWO to the BAR.

**Plaintiffs' Response:**

Not disputed.

16.  Inspectors from DCRA and/or HPO attempted to inspect the property on March 4, 7, and 8, 2003. DEx. 10, "Statement of Facts" at 2. The inspectors were denied entry on these occasions, or told that no work was being performed. *Id.*

**Plaintiffs' Response:**

Disputed.   On March 4, 2003, Defendant Toni Cherry entered plaintiffs' home without permission; Ms. Elkins asked her to leave.  On March 7, 2003, two inspectors sat in their car in the alley adjacent to plaintiffs' home for several hours, but never requested entry. L. Elkins Decl at ¶19.

17.  By letter dated March 10, 2003, DCRA requested that plaintiffs voluntarily provide

access to the property. Declaration of Denzil Noble ("Noble Decl.") (copy attached as DEx. 11) dated May 22, 2003, at ¶ 4. Consent to the inspections was refused. *Id.*

**Plaintiffs' Response:**

Not disputed.   Because the parties were in litigation, plaintiffs insisted that the inspection take place in compliance with the discovery rules of the Superior Court for the District of Columbia. Pls.' Ex. 19; L. Elkins Decl. at ¶ 21.

18.  The District applied for an administrative search warrant on March 26, 2003, and a judge of the Superior Court approved the application that same day. DEx. 10. At the time of the application, the District believed that plaintiffs were in violation of two SWOs and a NOV. *See* DEx. 10, "Statement of Facts" at 1–2.

**Plaintiffs' Response:**

Disputed. The purported search warrant was invalid because it was not obtained in compliance with Rule 204 of the District of Columbia Superior Court Rules of Civil Procedure and was based upon a false affidavit.   The sloped roof (alleged ground for the Notice of Violation and the two stop work orders) was clearly visible from the street; no search warrant was required to inspect it, and this was not the probable cause stated in Defendant Noble's affidavit.   The sloped roof posed no "imminent threat to public health, safety and welfare," the probable cause alleged in the affidavit.

19.  The search warrant for inspection of the property was executed on March 27, 2003, by officers of the Metropolitan Police Department, Juan Scott, Denvert Boney (inspectors from DCRA), and instant defendant Toni V. Williams-Cherry. Noble Decl. ¶¶ 5–6. Ms. Cherry took photographs during the inspection. *Id*. ¶ 6.

**Plaintiffs' Response:**

Disputed.   Defendants conducted a warrantless search of plaintiffs' home on March 27, 2003, harassed Ms. Elkins and her two children, searched and seized plaintiffs' personal papers and effects, all without probable cause and without a valid search warrant. L. Elkins Decl. at ¶¶ 22-26; *see also* Pls.' Brief at 29-36.

20.  The photographs taken during execution of the administrative search warrant show what appears to the District to be illegal construction, outside the scope of the building permits issued to plaintiffs. *Id*. ¶¶ 7–13.

**Plaintiffs' Response:**

Disputed. The photographs show no such illegal construction.   Plaintiffs note that the affiant, Defendant Noble, has never viewed plaintiffs' home and misinterprets the photographs allegedly taken by Defendant Cherry who has not been put forward to authenticate or describe the scenes depicted.

21.  After a telephone conference of July 3, 2003, with the BAR (re: *Robbins v. DCRA*, Dkt. No. 03-5961-BP), plaintiffs "completed the remaining work in their home requiring permits . . . ." *Id*. The BAR issued an Order dated July 9, 2003 (DEx. 13), which summarized that telephone conference, and declined to invalidate the SWO. *Id*. at 2.

**Plaintiffs' Response:**

Not disputed. During the telephone conference with counsel, the hearing officer indicated her intention to invalidate the stop work order: "It was clear, however, by the end of the telephone conference, that both the Presiding Board Member and counsel anticipated that the Board would issue an order holding the stop work order invalid on its face . . . ." Defs.' Ex. 13 at 2.  Plaintiffs reasonably proceeded on the basis of that indicated SWO, which the hearing officer subsequently reversed.  *Id.*

-10-

22.    Both parties in the Superior Court litigation filed dispositive motions and oppositions.   That court, by Order dated July 17, 2003, denied plaintiffs' Motion for Summary Judgment.

**Plaintiffs' Response:**

Not disputed.

23.   The Superior Court, by Order dated August 1, 2003 ("August Order") (DEx. 15), also denied the District's Motion to Dismiss or, in the Alternative, for Summary Judgment, finding, *inter alia*, that the court had subject matter jurisdiction until "Defendants . . . seek permit revocation pursuant to [12 DCMR § 108.9.]" August Order at 3. The court further determined that if the District proposed to revoke plaintiffs' building permits, such an action would "trigger the contested case provisions of the [D.C. Administrative Procedure Act] thereby requiring Plaintiffs to exhaust their administrative remedies, followed by judicial review in the D.C. Court of Appeals." August Order at 3.

**Plaintiffs' Response:**

Not disputed.

24.   The Superior Court also held that *res judicata*, as asserted by plaintiffs, did not bar the District from challenging the validity of plaintiffs' construction, because the "District and [the owners] were both defendants in the [prior] litigation and neither party asserted any cross-claims against the other." *Id*. at 3, 5 (*citing Lowery v. Muse*, 151 A.2d 263, 265 (D.C. 1959)).

**Plaintiffs' Response:**

Not disputed.   Because, however, this case was subsequently dismissed without prejudice for lack of subject matter jurisdiction, Pls.' Ex. 10, this Order has no *res judicata* effect.  *See* Pls.' Brief at 21-23.

25.  By letter dated December 17, 2003, DCRA proposed to revoke plaintiffs' "Building Permit Number B436647, issued to [plaintiffs] on April 27, 2001, and all subsequent approvals and revisions for Amended Permit Numbers B440371, B440544, B444341, B444561, B446508 that were issued for the premises known as 20 Ninth Street, N.E., Washington, D.C." (DEx. 16, at p. 1).

**Plaintiffs' Response:**

Not disputed.  This letter was based primarily on documents seized during the March 27, 2003, warrantless search and seizure.

26. By order dated January 16, 2004, the BAR dismissed as moot plaintiffs' pending appeal there because of DCRA's proposed permit revocation.

**Plaintiffs' Response:**

Not disputed.

27. On or about February 11, 2004, plaintiffs filed a Petition for Review in the D.C. Court of Appeals (DEx. 17), arguing that the BAR's dismissal of plaintiffs' appeal "deprived us of a merits decision" on the validity of the permits.

**Plaintiffs' Response:**

Not disputed.

28. After oral argument on March 23, 2004, by Order dated March 26, 2004, the Superior Court dismissed plaintiffs' complaint there without prejudice, for the reasons stated in the District's Second Motion to Dismiss (*i.e.*, lack of subject matter jurisdiction and failure to exhaust administrative remedies). That order has since also been appealed to the D.C. Court of Appeals.

**Plaintiffs' Response:**

Not disputed.

Respectfully submitted,

/s/

_____

Roger J. Marzulla, D.C. Bar No. 394907
Nancie G. Marzulla, D.C. Bar No. 400985
MARZULLA & MARZULLA
1350 Connecticut Avenue, NW
Suite 410
Washington, DC  20036
(202) 822-6760
(202) 822-6774 (facsimile)

Counsel for Plaintiffs

Dated: May 24, 2004