# Plaintiffs' Exhibit No. 7

1  is an extraordinary day and as any lawyer knows, if you
2  have one good one, that's enough for a couple of days.
3  I'm going to try to work with you all on this and we'll
4  see where we go. We may not even be able to finish this
5  today. I don't know. It may be more appropriate in a
6  courtroom. I don't know what I'm going to hear. But how
7  did you foresee the proceeding today, Counsel for the
8  Government?
9        MR. SAINDON: Your Honor, preliminarily, I was
10 going to address the, briefly, issues of standing and the
11 irreperability and the lack of imminent harm here.
12       THE COURT: All right. Those are your general,
13 those are the general --
14       MR. SAINDON: Right. The general TRO questions.
15 And I was going to have Mr. Ford and my DCRA witnesses
16 available. And I would proffer that the owners of the
17 property are fully in compliance with the permit and the
18 plans that they submitted according to their various
19 permits. So that, essentially, was going to be my
20 position.
21       THE COURT: On a factual --
22       MR. SAINDON: On a factual basis, they are in
23 full compliance with their building permits.
24       THE COURT: On a factual basis.
25       MR. SAINDON: Yes.

1      As I have indicated before, DCRA will testify
2 that the owners of the property are in full compliance
3 with their permits. As Mr. Hitchcock indicated earlier,
4 they have been in and worked with DCRA repeatedly, there
5 have been a number of Stop Work Orders issued so they can
6 come in, bring the project in compliance, to provide
7 updated plans, revised plans to show what they intend to
8 do on the site and what they are in fact doing on the
9 site. That, essentially, is the essence of our case.
10 There is nothing imminent now that needs to happen
11 immediately, say, over the next 10 days, if the case needs
12 to be stopped. DCRA believes that the property owners are
13 in full compliance with their permit and that's why they
14 haven't issued the Stop Work Order that has been
15 requested.
16      But again, to the extent that there is -- the
17 work, as I understand, is a renovation right now and it's
18 ongoing. And again, it can be taken back down to the
19 structure as it was before any work occurred and then any
20 damages can be remedied by money damages. So there's
21 nothing, like I said, imminent that's going to change that
22 we need to have relief right now.
23      THE COURT: Nothing that's being built, if I
24 understand Mr. Hitchcock the way the -- it's interesting.
25 I had a case at the very end of last week, a Georgetown

1  Court, his statement to me as far as your office is
2  concerned, whatever is going on out there, and I haven't
3  been out there but I've seen the pictures that were part
4  of the exhibits, you all have pictures, is within the
5  permits that were given by the District.
6      MR. FORD: That's correct.
7      THE COURT: There's nothing, to your knowledge,
8  that is going on out there that is in violation of those
9  permits.
10     MR. FORD: That's correct.
11     THE COURT: From your position. Let me just ask
12 you this question. With respect to the height, there was
13 reference in the pleadings here to 12 feet, 9 inches,
14 something I remember.
15     MR. HITCHCOCK: The old structures --
16     THE COURT: The old structure.
17     MR. HITCHCOCK: -- were 12 and 9 in the rear.
18     THE COURT: What was the authority to build to
19 the height that they built to?
20     MR. FORD: A permit that was issued and plans
21 that were submitted indicated that there was going to be a
22 change in the height of the building. The plans did not
23 indicate the height, the (indiscernible) of the building.
24 The permit application I think that goes with that, said
25 something that a wall 10 feet long on one side, south

32

1   wall, other wall, 22-1/2 feet long, I think that's the
2   north wall, built to, there was a statement, built to the
3   height of the original wall. The plans that goes along
4   with that permit did not show a height on the plan. The
5   staff -- the plan was approved by the Historic
6   Preservation staff person, which occurs in many cases.
7   All permit applications do not go before the Board. They
8   can be reviewed by staff and approved by staff and the
9   permit application can go on. And in this case, this is
10  what happened.
11          The plans, what we normally look for in plan
12  review is that if something is not to be included in a
13  project, then that area is X'd out. In this case, it was
14  not X'd out.
15          THE COURT: X'd out, I'm sorry. I --
16          MR. FORD: X'd out meaning that it will not be
17  included in the approval. This is something that may
18  occur in another phase at another time. In this case, it
19  was not X'd out. It was a part of a full sheet of section
20  drawings, plans, floor plans and it was signed, as I said,
21  by a staff person from the Historic Preservation. Also,
22  it was reviewed by the plan reviewers in Department of
23  Consumer Regulatory Affairs Plan Review Section. They
24  also reviewed it. The review that comes subsequent to
25  Historic Preservation is based on the approval of Historic

1  Preservation. If Historic Preservation had not approved
2  it, then the plan reviewers would not review it, they
3  would have stopped it right there. But it was reviewed
4  and approved.
5       THE COURT: Given you wouldn't have approved it,
6  you would have stopped it.
7       MR. FORD: We would have stopped it. We would
8  have not even looked at it.
9       THE COURT: Oh, okay.
10      MR. FORD: Would not have even looked at it.
11 But because it had a stamp and a signature of the person
12 that reviewed it and it was signed in the area on the back
13 of the application by the plan reviewer for Historic
14 Preservation, we went on and approved, reviewed it and
15 eventually approved it.
16      Another permit went out dealing with the
17 exterior of the building, and it was also approved by the
18 same person who approved for the plans sent. So we have
19 two approvals coming from Historic Preservation, two
20 approvals coming from the plan reviewers, meaning the
21 structural plan reviewers from Department of Consumer
22 Regulatory Affairs. So in essence, we had a righteous
23 permit, a permit that's correct to go out. Now, if there
24 was a flaw in that process, a flaw in that plan, whether
25 intentional or unintentional, I can't issue or could not

1  issue a Stop Work Order for that because it's not within
2  the Stop Work Order section for me to do that. So in
3  essence, we have, had a good permit. The last permit that
4  was issued was for interior work only, and it showed --
5        THE COURT: So what you're saying is in those
6  others, there was no height designation that said it was
7  going to go to the original --
8        MR. FORD: No. There was no height designation.
9        THE COURT: As such. If the plans were there,
10 could you interpret from the plans how high it was going
11 to go?
12       MR. FORD: First thing you learn in
13 architectural school or drafting is that you do not scale
14 the plan because the plan is a copy in most cases,
15 shrinkage and so on and so forth. But the fact is that
16 the plan was reviewed by Historic Preservation.
17       THE COURT: Okay.
18       MR. FORD: That's our key. They approved it, so
19 we, in essence, approved it. The last permit that was
20 issued and signed off by me and not by Historic
21 Preservation, was for interior work. That permit or any
22 permit that goes through Historic Preservation for review
23 for interior work, it's just a precautionary type thing,
24 just letting them know that this work's to be done and so
25 on and so forth. Historic Preservation has, has no input

35

1  you're not supposed to expand a nonconforming use, you
2  keep a nonconforming, you go back to what it was. But
3  what you're saying is the -- you actually are higher even
4  under a nonconforming use, is that what you're telling me?
5       MR. BELLOW: You can go higher, sir, because
6  you're allowed structural modernizations to an existing
7  nonconforming use.
8       THE COURT: To an existing nonconforming use.
9       MR. BELLOW: What you're not allowed is an
10 addition or enlargement. So in fact, when the Elkins, I'm
11 sorry, Ms. Elkins added a second floor around the kitchen
12 area, that would have created a nonconformity for zoning
13 purposes and that would have crossed the threshold of what
14 the permit allowed. So this latest permit was issued to
15 remedy that nonconforming aspect of the structure. In the
16 original set of plans that was filed and approved by the
17 Historic Preservation Office, it clearly indicated that a
18 flat roof was going to be changed to a pitch roof and was
19 going higher than what the roof was before. So that it's
20 not unreasonable to believe that the condition that was
21 written on an amended permit only referred to the portion
22 of the wall that needed replacement because they found out
23 in the course of construction that that was not
24 structurally sound enough to hold up, hold up the entire
25 wall.

1  thought it was going to go, has it been done illegally or
2  improperly, or secretly in the dead of night or anything
3  like that. This is not that type of case.
4       I find that -- another thing I want to say at
5  the very outset. Historic Preservation people have not
6  been left out. This is not a case where they have been
7  left out in the cold and somebody has done that, taken
8  action without notifying them. Because on several
9  occasions, as Mr. Ford told me and indeed on the exhibit
10 shown to me by Mr. Robbins, and explained to me the pitch
11 in the roof here on the drawing to scale, was signed off.
12 Well, it hasn't been signed off by the Board as such
13 historic, the top people of Historic Preservation, but it
14 is on behalf of Historic Preservation, signed off. And
15 they've done that on more than one occasion and that was
16 important to Mr. Ford's analysis in looking at the case.
17      Still, an open question that's very interesting
18 to me, you could have a case just because somebody signed
19 off on it, that you see something that's just flat out
20 wrong, whether the city would then just say well, they
21 signed off, I'll go along with it because it doesn't, if
22 the zoning has signed off, it doesn't violate overall
23 zoning. But I can conceive of a case like that coming
24 along and I would hope that the city would always look at
25 these things carefully and not just see Historic

1   Preservation with a stamp. Because there could be a
2   situation where there could be a mistake made. I don't
3   find that in this case, especially this drawing.
4        So the issues really before me are four. That's
5   all I have before me today. I don't have whether or not
6   Mr. Stevens will ultimately prevail. That's not the
7   issue, whether he will ultimately prevail and, or whether
8   or not the Williams, Clark and there will be interveners
9   or named Defendants, whether they will ultimately prevail.
10  The issue before me today is whether there's immediate
11  irreparable, whether there's irreparable injury that I can
12  get my hands on as a judge and do something about if I
13  also find that there's a substantial likelihood of success
14  on the merits, more hard lies to one side than the other,
15  meaning more to the plaintiff than the Defendant. And
16  then again, where lies the public interest.
17       Well, putting this in reverse order, public
18  interest I think I've talked about. It's an historical
19  preservation district and therefore, the public does have
20  an interest in whatever goes on or is being done,
21  especially if you look at the statute on Historic
22  Preservation and complying with whatever needs to be done
23  to comply with the rules and regulations that apply when
24  you're in an historic district. And they can be very
25  difficult when you buy property and live in these, whether

1  able to even do anything to it. I would think that would
2  be inappropriate at this place. It does not tilt -- I
3  would find more harm to the interveners. The
4  ※interveners※ represented by Mr. Collins today.
5          So when I put this together, keeping in mind
6  that I'm sitting here in equity, I'm supposed to put on
7  the old chancellor's hat of old and balance the equities
8  in this case, and the posture this comes to, the fact that
9  zoning has approved this, building inspectors have
10 approved this, the city takes the position that things are
11 in compliance, they have an interest to make sure things
12 aren't done improperly. Gosh knows they have an interest,
13 they do it every day. They really do it every day. And
14 Historic Preservation would have a right to do something
15 and they're on notice, apparently, that this is going on.
16 They've given two approvals, and there's been contact with
17 them. They haven't come and said Judge, we really think
18 things shouldn't go forward here today. They haven't
19 asked to intervene today and to take action. Take back
20 the permits, we've made a mistake, they're going up too
21 high or anything like that, at least that's not been
22 presented to me.
23         MR. HITCHCOCK: Your Honor, may I make a proffer
24 to that?
25         THE COURT: Yes.

64

```
 1                  MR. HITCHCOCK:  I didn't want to interrupt the
 2       Court.
 3                  THE COURT:  All right.
 4                  MR. HITCHCOCK:  It bears directly on that point.
 5                  THE COURT:  Okay.
 6                  MR. HITCHCOCK:  The Historic Preservation -- the
 7       concerns of the Historic Preservation Division were not
 8       addressed prior to the lifting of the Stop Work Order.  As
 9       I understand it, they would have been content to keep it
10       in place, so we --
11                  THE COURT:  Do they know this proceeding is --
12       well, they can come in at preliminary injunction.  If they
13       feel -- I accept what you're telling me.
14                  MR. HITCHCOCK:  Right.  I mean, I want the
15       record to be clear it's not as if we haven't, that there's
16       a remedy out there that we haven't done.  My understanding
17       is, I'll let Mr. Saindon speak to this, DCRA lifted the
18       Stop Work Order, Historic Preservation Division would have
19       preferred to keep it in place is my understanding.
20                  THE COURT:  But they haven't taken any formal
21       position here today.
22                  MR. SAINDON:  No, they haven't.
23                  MR. HITCHCOCK:  No.
24                  MR. SAINDON:  And they are aware of the
25       proceeding.
```