UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LAURA ELKINS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 04-0480 (RMC) |
| ) | |
| DISTRICT OF COLUMBIA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants, pursuant to Fed. R. Civ. P. 12(b)(6) and 56(b), have moved this Court to

dismiss the complaint or, in the alternative, for summary judgment. Plaintiffs have opposed

defendants' dispositive motion and cross-moved for partial summary judgment.

This memorandum of points and authorities is provided in reply to plaintiffs' opposition

and in opposition to plaintiffs' dispositive motion in accordance with LCvR 7.1(b) and (d). As

required by LCvR 56.1, defendants' opposition to plaintiffs' Statement of Material Facts As to

Which There is No Genuine Issue ("PSMF") has been provided.

## I. Preliminary Statement

Plaintiff Elkins, with a degree in architecture, and plaintiff Robbins, also an architect and

the Assistant Director for Historic Preservation in the National Center for Historic Preservation

of the National Park Service, submitted an incomplete building-permit application and incomplete plans, in the hopes of avoiding a substantive review of their planned extensive construction on their home in the Capitol Hill Historic District. Plaintiffs' submission to the District was misleading, and the District erroneously granted the building permit. Declaration of David Maloney, dated June 15, 2004 ("2004 Maloney Decl.") at ¶¶ 5–8 (copy attached). Plaintiffs seek to prevent the District from correcting errors in the permit-approval process (some of which may well flow from their earlier inadequate submittals), and from enforcing District law.

Plaintiffs seek partial summary judgment on two issues: the validity of their building permits and the invalidity of the administrative search warrant. Plaintiffs' motion must be denied. This Court—like the D.C. Superior Court—cannot determine the validity of the building permits here (a local-law issue), because plaintiffs have not exhausted their administrative remedies, hence their challenge is unripe. As to the validity of the administrative search warrant, even conceding the facts as alleged by plaintiffs, there is ample evidence in the record to support its validity.

There are no material facts at issue here; the few disputed contentions are entirely legal in nature and may be decided on the instant record. Although plaintiffs struggle mightily to concoct material factual disputes, there are none. Plaintiffs purport to need some discovery here, but never explain what that discovery would accomplish, aside from the obvious harassment of the District and additional, needless delay. There is more than enough evidence in the record to dispose of this matter. Discovery here would be, at best, unnecessary, and at worst, a further delay on an already lengthy proceeding to determine this relatively simple matter of *local* law, which has by now consumed hundreds of hours in a number of administrative and judicial fora.

Plaintiffs' claims present a truly self-serving and fantastic vision of the government permitting process—that regardless of the accuracy and completeness of a permit applicant's original submission, and regardless of any subsequently discovered District errors in the process, *any* permit granted, once issued, is irrevocable. This scenario cannot be the law. Indeed, as shown below, it is not. *See infra* pp. 6–11.

Plaintiffs go through strenuous contortions to avoid classifying their theory for what it really is—plaintiffs seek *equitable estoppel* against the District: Plaintiffs believe that the District should be estopped from denying the initial, erroneous approval by the Historic Preservation Office of their project, on which they claim to have relied.[1] In other words, plaintiffs' position seems to be that if you fool the District once (or if the District ever makes a mistake), it can never go back to examine the underlying application-review process. The Court should not provide judicial support for this cynical argument.

If plaintiffs' theory were correct, the District could not correct any error it discovers in any permit or license, no matter the seriousness of the error in the document or process, and no matter the reason for or impact of the error. Such a result would engender chaos, as the District would be forbidden from ever re-examining its actions and District employees would be in a constant state of anxiety that they would commit an irreversible error to the lasting harm of the District. Such a result would also encourage other applicants to misrepresent or exaggerate the truth on applications to the District, knowing that once granted, any licenses or permits would be valid permanently. Surely this should not be the case.

---

[1]    Indeed, Judge Mencher noted as much regarding plaintiffs' chief theory in the Superior Court litigation on the validity of their building permits: "It really is almost like an estoppel. You've let us go this far and we have the right to – to keep going. I have to reject that in this case." DEx. 9 at 47.

Plaintiffs, prior to submitting their original building permit application, met with a number of District employees to discuss their plans, and now freely admit changing their proposed scope of work to avoid substantive review (and to being told that their plans—a second-story addition) would not pass muster). PSMF ¶ 4; Declaration of Olutoye Bello, dated May 22, 2003, ("Bello Decl.") (copy previously attached to Defendants' Motion to Dismiss as Defendants' Exhibit No. ("DEx.") 3 at 1; Declaration of Laura Elkins, dated May 24, 2004 ("Elkins Decl.") ¶¶ 4–5 (copy previously submitted as Plaintiffs' Exhibit ("PEx.") 2 to Plaintiffs' Memorandum of Points and Authorities ("Plaintiffs' Memo")).[2]

While plaintiffs admittedly planned on extensive additions to the rear of the property, the acting Zoning Administrator, then Mr. Bello, told them that doing so might violate lot-occupancy requirements and constitute an illegal expansion of a nonconforming structure. Bello Decl. ¶ 4; Affidavit of Olutoye Bello, dated February 17, 2004 ("Bello Aff.") at ¶ 5 (copy previously submitted as PEx. 3). Mr. Bello also explained that, because the property is in a historic district, plaintiffs could not do what they originally proposed without extensive, public review, either as part of a special exception proceeding at the Board of Zoning Adjustment ("BZA"), or in a proceeding before the HPRB. Bello Decl. ¶ 4.

Although the property is a nonconforming structure, Mr. Bello informed plaintiffs that, to remain compatible with the zoning regulations, they could conceivably raise one side of the flat roof of their garage to a pitched, "shed" roof, pursuant to 11 DCMR § 2001.2. Bello Decl. ¶ 5; Bello Aff. ¶ 8. Otherwise, the addition of a full story would require the approval of the BZA, pursuant to 11 DCMR § 2001.3. Bello Decl. ¶ 5; Bello Aff. ¶ 5. As discussed, the proposed

---

[2]    The District notes that plaintiffs have not provided a sworn statement as to exactly how their addition is configured. *Cf.* Complaint ¶ 28(e) ("art studio"); Elkins Decl. ¶ 2 ("art studio"), ¶ 10 ("[storage] loft above the kitchen").

conversion of the garage roof from flat to "shed" was for the garage only, not all connecting structures between the garage and the main house, as subsequently occurred. Bello Decl. ¶ 5. Mr. Bello, as acting Zoning Administrator, could speak only to the zoning issues regarding plaintiffs proposed construction, not to the compatibility of such an approach with historic-preservation requirements or to compliance with the building codes. *Id.* at 6.

Mr. Bello's subsequent review of the drawings that plaintiffs submitted with their initial building permit application showed the increase in the garage roof line, but did not show a floor within that garage structure on the plan. Bello Decl. ¶ 8. The extra volume within the garage that plaintiffs had discussed with Mr. Bello was understood by him to be for storage only, and not for habitable space. *Id.* Additionally, while the drawings did show the flat garage roof going up, they were done from the alley view only (*i.e.*, there were no side elevation drawings submitted); side elevations would have made it considerably easier for reviewers to see the full scope of the construction planned by plaintiffs. *Id.* at 9; Declaration of David Maloney, dated January 2, 2003, ("2003 Maloney Decl.") ¶ 8 (copy previously submitted as DEx. 4 to Defendants' dispositive motion).

Mr. Bello's most recent affidavit, submitted as PEx. 3, does not contradict these facts. Plaintiffs now admit what the District has suspected from the beginning—that they went to considerable effort to *avoid* substantive review of their planned project, or even substantive understanding of the drawings they submitted, which would have triggered the reviewers' recognition that such further regulatory review was required. PSMF ¶ 4; Elkins Decl. ¶¶ 4–5; 2004 Maloney Decl. ¶¶ 5, 7–8.

II. Argument

A.    Plaintiffs Cannot Invoke Equitable Estoppel Here Against The District.

Although they never explicitly invoke the doctrine of equitable estoppel, plaintiffs here seek to prevent the District from challenging the validity of their building permits. The Supreme Court has issued "powerful cautions against the application of the doctrine to the government." *Rann v. Chao*, 346 F.3d 192, 197 (D.C. Cir. 2003) (*citing OPM v. Richmond*, 496 U.S. 414, 419–24 (1990) *and Deaf Smith County Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1214 (D.C. Cir. 1998)). *See also ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) (the doctrine's "application to the government must be rigid and sparing."); *Heckler v. Community Health Servs.*, 467 U.S. 51, 60 (1984) ("[I]t is well settled that the Government may not be estopped on the same terms as any other litigant.").[3]

Successful invocation of equitable estoppel requires—at least—a showing of the traditional elements of estoppel. *Rann*, 346 F.3d at 197 (showing of traditional elements of estoppel "would certainly be necessary before the court even considered whether to apply estoppel against the government here.").

> The case for estoppel against the government must be compelling, and will certainly include proof of each of the traditional elements of the doctrine—"'false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance,' as well as . . . 'a showing of an injustice . . . and lack of undue damage to the public interest.'"

---

[3]     "[N]either the Supreme Court nor this Circuit has ever upheld a finding of equitable estoppel against the Government." *United States v. Philip Morris, Inc.*, 300 F.Supp.2d 61, 70 (D.D.C. 2004) (citations omitted).

*ATC Petroleum*, 860 F.2d at 1111 (*quoting International Org. of Masters, Mates & Pilots v. Brown*, 698 F.2d 536, 551 (D.C.Cir.1983)).[4] *See also Schweiker v. Hansen*, 450 U.S. 785, 788–90 (1981)). *Cf. Georgetown Entertainment Corp. v. District of Columbia*, 496 A.2d 587, 591–92 (D.C. 1985) (elements of equitable estoppel are: (1) a government "promise," (2) plaintiffs suffered injury due to (3) a reasonable reliance on the promise, and enforcement of the promise would (4) be in the public interest and (5) prevent injustice).[5]

The rationale for this heightened burden to apply equitable estoppel against the government is that "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Philip Morris, Inc.*, 300 F.Supp.2d at 70 (*quoting Heckler*).

Plaintiffs cannot come close to making this showing. Here, there was no false representation (at most an erroneous interpretation), there was no "purpose to invite action" by plaintiffs, there was no ignorance of the true facts by plaintiffs (who must have known all along what they planned to construct), there was no "reasonable" reliance (as discussed below), nor can there be any showing of an injustice and lack of undue damage to the public interest, considering

---

[4]     *Cf. Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000):

> Even in circumstances where the doctrine of equitable estoppel is applicable, the following elements, at least, must be established: that there was a 'definite' representation to the party claiming estoppel; that the latter 'relied on its adversary's conduct in such a manner as to change his position for the worse'; and that the reliance was 'reasonable.'

*Id.* (*quoting Heckler*, 467 U.S. at 61).

[5]     While Supreme Court precedent has suggested that "affirmative misconduct" would be required to invoke equitable estoppel against the government, this Circuit has apparently left the question unresolved. *See Philip Morris, Inc.*, 300 F.Supp.2d at 70 n.10 (*citing Grumman Ohio Corp. v. Dole*, 776 F.2d 338, 347 n.8 (D.C. Cir. 1985)).

the compelling public interest in upholding the laws. *See New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State [or local government] is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury.")

Plaintiffs apparently allege that they relied on the grant of the original building permit (and the representations of Mr. Bello and, later, Mr. Ford) in completing the construction on their property. Plaintiffs' Memo at 3–4. But surely those oral representations, if accurate, could not have bound the District regarding the *historic-preservation* aspects of the construction. Even assuming the doctrine applies here, a government employee cannot estop the government beyond his lawful authority. *Waukesha State Bank v. Nat'l Credit Union Admin. Bd.*, 968 F.2d 71, 74 (D.C. Cir. 1992). *See also ATC Petroleum*, 860 F.2d at 1109 ("As a general rule, the government is not bound by the statements or assurances of its officers where the actual authority to make such statements is lacking.") (*citing Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)). "[P]arties dealing with the Government 'are expected to know the law and may not rely on the conduct of government agents contrary to the law.'" *Id.* at 1111 (*quoting Heckler*). That rule is even more pertinent given plaintiff Robbins' extensive work experience in the field of historic preservation. "[T]here is no grave injustice in holding parties to a reasonable knowledge of the law." *Id.* at 1112.

Even if plaintiffs' permits themselves can be construed as government "representations," plaintiffs' reliance on those permits cannot be considered "reasonable." In light of the vague and/or incomplete initial building permit application and plans, arguably intended to confuse the District and conceal the full extent of their planned construction, plaintiffs can hardly claim any *reasonable* reliance on the government's initial issuance of the permits. Moreover, prohibiting all

government challenges to the permits would clearly *not* be in the public interest and would not prevent injustice. *See Georgetown Entertainment Corp.*, 496 A.2d at 591–92.

At worst, the District's actions in the grant of the initial building permit here were arguably negligent from the plaintiffs' perspective; by no means could the District's behavior be construed as "affirmative misconduct." In fact, it can be argued that, rather than "reasonably rely" on legitimate government conduct, plaintiffs literally "bet the house" that their combination of incorrect statements on their applications and deceptive and incomplete drawings would escape the District's notice until plaintiffs were living in their new, bigger addition. They lost this bet; they cannot hedge the bet now by asserting that the District should have caught them earlier.

Resolving this matter in plaintiffs' favor would effectively enjoin the District from enforcing its zoning, building-permit, and historic-preservation laws. "[A]ny time a State [or local government] is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). *See also District of Columbia v. Greene*, 806 A.2d 216, 223 (D.C. 2002) (*quoting New Motor Vehicle Bd.*).

If plaintiffs' relief were to be granted, the door would be opened to allow every person unhappy with District building-permit or historic-preservation decisions to bypass the administrative process: Every applicant who does not fully or truthfully fill out his or her application or who builds beyond what is authorized by the permit will run to court crying "estoppel" if the government subsequently discovers the misdeeds.

A recent case in this Court has many important parallels to the instant matter, and considerably more compelling facts. In *American Towers, Inc. v. Williams*, 146 F.Supp.2d 27

(D.D.C. 2001), a company applied for and received from DCRA a building permit to construct a 756-foot telecommunications tower. *Id.* at 29. Some six months after construction began, DCRA "belatedly identified [specific errors] in the original permit review process that resulted in an ostensibly erroneous issuance of the permit." *Id.* The chief error appeared to be that DCRA had failed to realize that the tower would not be in compliance with the District of Columbia Height Act, originally enacted by Congress in 1910, which prohibits any structure over 600 feet in height without a waiver prior to construction. *Id.* at 31 (*citing* D.C. Code § 5-405(h) (1999 Supp.)). The District subsequently sought to "rescind and cancel" the building permit based on these errors. *Id.* at 30. The company sued, alleging, *inter alia*, that equitable estoppel prevented the District from rescinding the building permit, because the District's original grant of the building permit was an implicit waiver of the Height Act's requirements. *Id.* at 31.

The court dismissed the company's claim in its entirety, so that the case could be refiled in the "proper" forum, *i.e.*, the Superior Court or the appropriate administrative agency. *Id.* at 30. While the court expressed sympathy with the company's argument that the District was "fully aware of the height of the tower throughout the process[,]" it held that the question of whether the District implicitly waived the Height Act when it issued the permit "is not one of constitutional import; it is a question of state law and its resolution is best left to the local courts." *Id.* at 31. *See also George Washington Univ. v. District of Columbia*, 318 F.3d 203, 213 (D.C. Cir. 2003) (Henderson, J., concurring) (the majority's analysis of local land-use matter "properly balances the need for local autonomy in a matter of paramount local concern with

recognition of constitutional protection at the very outer margins of municipal behavior.") (*quoting Gardner*, 969 F.2d at 69)).[6]

Here, while it is clear that not all District officials knew the full extent of plaintiffs' planned construction, 2004 Maloney Decl. at ¶¶ 7–8, the District similarly contends that the implicit argument raised by plaintiffs—equitable estoppel—is *not* one of constitutional import; it is a question of state law and its resolution is best left to the local administrative process.


B.    Plaintiffs' Conspiracy Counts Must be Dismissed.

The District asserted that plaintiffs have failed to properly allege a civil conspiracy. Plaintiffs' opposition fails to counter the District's arguments, and hence summary judgment on the conspiracy claims must be granted to the District.

Plaintiffs fail entirely to confront the District's main challenge: that in order to show civil conspiracy, a plaintiff must plead and prove, *inter alia*, a "tortious interference with the rights of others . . . motivated by some class-based, invidiously discriminatory animus." *Hobson v. Wilson*, 737 F.2d 1, 14 (D.C. Cir. 1984), *overruled in part on other grounds, Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)). *See also Soeken v. Herman*, 35 F.Supp.2d 99, 102 n.3 (D.D.C. 1999) (to assert a civil conspiracy claim, plaintiff must allege membership in protected class, and that defendants acted with a class-based, discriminatory animus); *Wesley v. Howard Univ.*, 3 F.Supp.2d 1, 3 (D.D.C. 1998) (to be actionable, section 1985 claims require "a cognizable predicate act of discrimination."); *Beran v.*

---

[6]    Judge Henderson additionally noted that federal courts should "hesitate before intervening in local land disputes[.]" *George Washington Univ.*, 381 F.3d at 213 n.2 (*quoting Gardner*, 969 F.2d at 67–68: "Federal courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes.") (additional citations omitted).

*United States*, 759 F.Supp. 886, 893 (D.D.C. 1991) (42 U.S.C. § 1985 is not applicable to *all* tortious conspiratorial interferences with the rights of individuals, but only those motivated by class-based discrimination, such as racial or other class-based animus).

Plaintiffs have never identified, much less alleged, the required class-based, invidiously discriminatory animus. Nor have plaintiffs ever indicated what "class" they belong to, for these purposes.[7] Plaintiffs' failure to do so requires dismissal of the conspiracy claims.

Moreover, plaintiffs misinterpret controlling law, arguing that they need allege only two elements for civil conspiracy, Plaintiffs' Memo at 26. In actuality, as stated by the District, to prevail on civil conspiracy claims plaintiffs must plead and prove *four* elements: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983).[8]

Even assuming that plaintiffs' two-part test for civil conspiracy is correct, plaintiffs' allegations fail to meet it. Plaintiffs have failed sufficiently to allege a "meeting of the minds" to take some overt, tortious act in furtherance of the conspiracy. *See Sculimbrene v. Reno*, 158

---

[7]     The Supreme Court has clearly stated that 42 U.S.C. § 1985 was not intended to reach conspiracies motivated by economic or commercial animus. *See United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 837 (1983). *See also Thomas v. News World Communications*, 681 F.Supp. 55, 68 (D.D.C. 1988) (Section 1985 does not apply to conspiracies motivated by economic or commercial animus) (*citing United Brotherhood*).

[8]     Plaintiffs argued that *Hall v. Clinton*, 285 F.3d 74, 82–83 (D.C. Cir. 2002) stood for the proposition that there are only two elements to a claim of civil conspiracy, an agreement and an overt tortious act that causes injury. Plaintiffs' Memo at 26. Plaintiffs fail to reveal, however, that *Hall* merely set out the two "essential elements" of civil conspiracy, while citing the case cited by the District (*Halberstam*), which laid out a *four-part* test for civil conspiracy claims. *See Halberstam*, 705 F.2d at 477 ("A list of the separate elements of civil conspiracy includes [the four elements cited *supra*].").

F.Supp.2d 8, 16 (D.D.C. 2001) (*citing Halberstam* and *Graves v. United States*, 961 F.Supp. 314, 320 (D.D.C. 1997)); *Knowlton v. United States*, 111 F.Supp.2d 1, 8 (D.D.C. 1999) (plaintiff must allege facts that would support a conclusion that defendants actually possessed the same motives or objective) (*citing, inter alia, Graves*).

Plaintiffs continue to allege only some "meetings" at which orders were allegedly given regarding enforcement actions against the property in question. *See* Plaintiffs' Memo at 5, 10. This is a far cry from the "meeting of the minds" necessary to show a civil conspiracy. *See Knowlton*, 111 F.Supp.2d at 9 (mere fact that alleged conspirators worked for the same agency insufficient to raise a triable issue of (or infer) an agreement between them) (*citing Wesley v. Don Stein Buick, Inc.*, 996 F.Supp. 1299, 1308 (D.Kan. 1998)). At most, such gatherings evidence only ordinary meetings of administrative agencies, with supervisors directing a course of action for staff to follow. There was no *agreement* among the named defendants here to take the actions complained of, even if those actions could be construed to be constitutional torts. Plaintiffs' claim of a civil conspiracy must be dismissed. *See Knowlton*, 111 F.Supp.2d at 13 (to survive a motion for summary judgment on a civil conspiracy claim, plaintiff cannot rest upon mere allegations, but must set forth specific, admissible facts showing that there is a genuine issue for trial, *i.e.*, evidence that supports a "meeting of the minds") (*citing* Fed. R. Civ. P. 56(e)).[9]

---

[9]     To the extent plaintiffs argue that discovery is necessary here, Plaintiffs' Memo at 16, they have failed to even specify what that discovery would accomplish, such as evidence of the "agreement" necessary for a civil conspiracy. In any event, plaintiffs' paltry showing regarding the existence of a conspiracy is insufficient to warrant further discovery on that topic, let alone any others. *See Knowlton*, 111 F.Supp.2d at 13 n.8.

C.     Plaintiffs' Fourth Amendment Claims Must Be Dismissed.

The administrative search conducted on the property was valid, and plaintiffs' Fourth Amendment rights were not violated. Again, plaintiffs' misconstrue the District's position. The District does not "admit the falsity of Mr. Noble's affidavit." Plaintiffs' Memo at 32 n.5. Rather, the District presented argument "accept[ing] as true all of the complaint's factual allegations." *Tibbs v. Williams*, 263 F.Supp.2d 39, 41 (D.D.C. 2003) (*citing, inter alia, Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The District argued that, assuming the affidavit was flawed, there was sufficient information elsewhere in the statement to support a finding of probable cause for issuance of the warrant. *See United States v. Warren*, 42 F.3d 647, 653 (D.C. Cir. 1994) (so long as there remains sufficient content in the affidavit to support a finding of probable cause, setting aside the alleged falsity, the *criminal* search warrant will be valid) (*quoting Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)).[10] Plaintiffs have not contradicted this conclusion.

Plaintiffs again allege that the purported imminent threat to health, safety, and welfare was the "sole probable cause" alleged in the affidavit. Plaintiffs' Memo at 32. However, as the District has noted, leaving aside the veracity of that "imminent threat," at the time of the administrative search warrant, the District believed that plaintiffs were then in violation of two stop-work orders and a notice of violation. *See* SMF ¶ 18. Those facts, standing alone, are ample reason to support a finding of probable cause for an administrative search.

---

[10]     As the District has noted, an inaccurate statement in a *criminal* warrant affidavit invalidates the warrant only if the statement was (1) material to the issue of probable cause, and (2) "made knowingly and intentionally, or with reckless disregard for the truth." *Warren*, 42 F.3d at 653 (*quoting United States v. Richardson*, 861 F.2d 291, 294 (D.C. Cir. 1988) (*per curiam*), *cert. denied*, 489 U.S. 1058 (1989)). Notwithstanding that the search warrant in question was *administrative* (and hence may issue on a lesser showing of "probably cause"), plaintiffs cannot meet either elements of this test.

Moreover, the handful of cases cited by plaintiffs here are all *criminal* matters, for which the probable cause standard is higher than that for administrative search warrants, as earlier explained by the District. *See, e.g., Nat'l Eng. & Contracting Co. v. OSHA*, 45 F.3d 476, 479–80 (D.C. Cir. 1995) (standard of probable cause required for administrative search warrants is "not as stringent" as that required for criminal search warrants). Plaintiffs correctly cite D.C. Super. Ct. Civ. R. 204 as setting forth the standard for issuance of administrative search warrants, but fail to point out that, in contrast to D.C. Super. Ct. Crim. R. 41, rule 204 only requires that D.C. officials believe that "reasonable grounds" exist for such a search, not the "probable cause" so extensively defined in the criminal law. The District asserts, again, that plaintiffs' existing violations of District regulations were sufficient grounds, standing alone, to support the issuance of the administrative search warrant, especially in light of plaintiffs' continued refusal to allow an inspection of the property.

Plaintiffs make the conclusion—unsupported by any case law—that failure to comply with the requirements of rule 204 "renders the search warrant invalid."[11] Moreover, plaintiffs are clearly mistaken as to the facts surrounding the filing of the search warrant and return. Plaintiffs claim that the statement and return were never filed. Plaintiffs' Memo at 31. But a quick search by an undergraduate intern working in the undersigned's office indicates the falsity of that

---

[11]     Perhaps plaintiffs did not cite any case law because the case law is exactly converse to the proposition they advance. *See, e.g., United States v. Greene*, 141 F.Supp. 856, 858 (D.D.C. 1956) (statutory requirements of return of criminal search warrant are only ministerial; failure to comply will not invalidate valid warrant, nor render inadmissible the articles seized). *See also United States v. Gerald*, 5 F.3d 563, 567 (D.C. Cir. 1993) (holding five-month delay in filing criminal warrant and return a "ministerial error" that did not call for exclusion of evidence); *Criales v. United States*, 621 A.2d 374, 377–78 (D.C. 1993) (failure to provide copy of criminal warrant and return to home's occupants, while a technical violation of the rules, was not "so egregious" as to invalidate search).

assertion. *See* Affidavit of David W. Reid, dated June 2, 2004 ("Reid Aff.") (copy attached).[12] A copy of the application for the administrative search warrant, and the return (with an inventory of the property seized), were easily obtained at the D.C. Superior Court with only the address of the property searched and the date of the search. *Id.* 3–5.

Plaintiffs are similarly incorrect regarding the legal standards for seizure of evidence during a search, citing, again, only *criminal* cases. The general rule is that the Fourth Amendment requires that items to be seized pursuant to a criminal search warrant must be specifically listed or generally described within the warrant. *See, e.g., Andresen v. Maryland*, 427 U.S. 463, 480 (1976). However, even if the warrant did not explicitly authorize the seizure of specific evidence (as plaintiffs allege here), the evidence acquired still could have been reasonably seized due to the "plain view" exception, which allows seizure of evidence observed in plain sight, if the evidence's "incriminating character is immediately apparent." *Horton v. California*, 496 U.S. 128, 136–37 (1990); *United States v. Garces*, 133 F.3d 70, 73 (D.C. Cir. 1998).[13] Thus, even items not specifically described in a search warrant may be seized if there is a sufficient "nexus" between them and the alleged unlawful activity. *See, e.g., U.S. v. Pindell*, 336 F.3d 1049, 1055–56 (D.C. Cir. 2003) (seizure of notebook during search of defendant's car was justified under "plain view" doctrine, because officer had previously interviewed victim who alleged robbery by suspect dressed as police officer who took notes in a notebook).

---

[12]     A copy of all documents obtained by Mr. Reid as referenced in his affidavit is also attached.

[13]     Plaintiffs claim that some documents observed by the District during the search were not in "plain view," but do not dispute that the *seized* documents were in plain view and voluntarily provided. *Cf.* Elkins Decl. ¶¶ 24–25; Declaration of Toni Williams-Cherry, dated June 15, 2004 ("Cherry Decl.") ¶ 11 (copy attached).

Here, the inspectors who assisted in the execution of the administrative search warrant observed documents that, to them, appeared to be evidence of illegal construction, exactly the sort of illegal activity the warrant was issued under, and hence the inspectors were entirely justified in seizing those documents, notwithstanding that plaintiff Elkins provided them voluntarily. *See* Cherry Decl. ¶ 11.

Moreover, while the exclusionary rule requires the suppression of evidence seized pursuant to a defective criminal search warrant, the "good faith" exception to that rule allows the seizure of evidence if the officers conducting the search acted in "objectively reasonable reliance" on the warrant, and if a reasonable officer would have concluded that the warrant authorized a search for the materials outlined in the affidavit. *U.S. v. Maxwell*, 920 F.2d 1028, 1034 (D.C. Cir. 1990); *U.S. v. Anderson*, 618 F.Supp. 1335, 1340–42 (D.D.C. 1985) (although pre-printed criminal search warrant form made reference to "items" to be seized, no specific items were listed; nevertheless, exclusionary rule should not apply because officers had objectively reasonable belief that the warrant authorized a search for the materials referenced in the affidavit). *See also U.S. v. Nicely*, 922 F.2d 850, 859 (D.C. Cir. 1991) (despite allegations that criminal search warrant was facially invalid for lack of sufficient specificity, warrant was "sufficiently particularized on its face" and affidavit was detailed enough that defendants' conduct did not rise to the level of "flagrant disregard" for the limitations in the warrant necessary to require suppression of the seized documents).

Here, even if the warrant itself technically failed to list individual items to be seized, the inspectors could have reasonably relied on Mr. Noble's affidavit, which referenced the District-alleged illegal construction which, in addition to being determinable by visual observation, could clearly be evidenced by drawings and plans (*i.e.*, drawings or plans not previously submitted to

the District)—exactly the type of documents seized during the search. *See* Plaintiffs' Exhibit No. ("PEx.") 2 at ¶ 25; Plaintiffs' Memo at 35.

Plaintiffs' Fourth Amendment claims must be dismissed.


D.   Defendants Cannot Be Judicially Or Collaterally Estopped Here.

Plaintiffs argue that the resolution of the *Stevens* litigation collaterally estops the District from challenging the validity of their building permits. Plaintiffs' Memo at 17. Plaintiffs are incorrect.

Although plaintiffs correctly set forth the collateral estoppel analysis, they fail to meet it. To establish collateral estoppel or issue preclusion, a party must show: (1) that the same issue now being raised was previously contested by the parties and submitted for judicial review, (2) that the issue was actually and necessarily determined by a court of competent jurisdiction in the prior case, and (3) preclusion would not work a basic unfairness to the party bound by the first decision. *Beverly Health & Rehabilitation Svcs, Inc. v. NLRB*, 317 F.3d 316, 322 (D.C. Cir. 2003) (*citing Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982)). The District asserts that the *Stevens* litigation fails all three elements of this test: the issue (validity of the permits) was never submitted for judicial determination, thus was never actually and necessarily determined by a court, and preclusion on that issue would work a profound unfairness on the District by throwing the ongoing administrative proceedings into chaos (and allow any disgruntled applicant to avoid the mandates of administrative exhaustion by running into federal court claiming constitutional violations).

The validity of plaintiffs' building permits has never been litigated in *any* forum. The third element of the collateral-estoppel test (no unfairness) will not likely be present "where the

fullness of [an issue's] first litigation is uncertain." *Milton S. Kronheim & Co., Inc. v. District of Columbia*, 91 F.3d 193, 197 (D.C. Cir. 1996). The overriding position of the District's previous argument in the various fora here is that plaintiffs should exhaust their administrative remedies regarding the validity of their building permits, and not have the courts decide that question in the first instance. Judge Terrell of the Superior Court approved of that logic, and dismissed plaintiffs' case there on that basis, as plaintiffs themselves acknowledge. *See* Plaintiffs' Memo at 12 n.3.

"The general rule is that parties to an action are not bound in subsequent controversies between themselves where they were not adversaries in the action in which the judgment was rendered and their rights and liabilities *inter se* were not put in issue and determined in that action." 47 Am. Jur. 2d § 674 at 121 (1995). *See also United States v. Berman*, 884 F.2d 916, 923 n. 9 (6th Cir. 1989) (*res judicata* is inapplicable where there was no prior adjudication between the parties because both government and the appellants were defendants in the previous action and neither filed a cross-claim against the other). Plaintiffs here and the District were co-defendants in *Stevens*, not adversaries.

In essence, plaintiffs assert that the District should have brought against them any claims it might have had at the time of the *Stevens* litigation and is now barred from doing so, even assuming that "the validity of plaintiffs' building permits" was a "claim" that the District could have asserted then.[14]

---

[14]    As the District noted in its Motion to Dismiss, a final judgment in a prior suit involving the same parties bars subsequent suits based on the same cause of action, and prevents the parties from relitigating the same claim or any claim *that might have been raised* in the first proceeding. *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (*citing Cromwell v. County of Sac, Iowa*, 94 U.S. 351, 352 (1876)); *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946 (D.C. Cir. 1983) (*citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979)). The District points out, again, that it *could not have raised* the issue of the validity of plaintiffs'

In other words, plaintiffs assert that the validity of the building permits was a "compulsory cross-claim." There are, of course, no compulsory cross-claims in federal (or local) courts. *See, e.g.*, 6 Wright, Miller & Kane, *Fed. Prac. & Proc.* § 1431 (2d ed. 1990):

> Rule 13(g) [governing cross-claims], unlike Rule 13(a) [governing compulsory counter-claims], always is permissive. A party who decides not to bring his claim under Rule 13(g) will not be barred by *res judicata*, waiver, or estoppel from asserting it in a later action, as he would if the claim were a compulsory counterclaim under Rule 13(a).

Moreover, even if a party in previous litigation had brought a cross-claim, it is not barred from bringing *other*, related claims in subsequent litigation. *See Answering Serv., Inc. v. Egan*, 728 F.2d 1500, 1503 (D.C. Cir. 1984) (mere bringing of one cross-claim did not require claimant to bring all other possible cross-claims; claim is *compulsory* only when asserted against *opposing* party). *See also United States v. Confederate Acres Sanitary Sewage & Drainage System, Inc.*, 935 F.2d 796, 799 (6th Cir. 1991) (cross-claims against co-defendants are *permissive*, hence trial court could not "compel" party to litigate its potential claim before it) (*citing Answering Serv., Inc.*); *Lowery v. Muse*, 151 A.2d 263, 265 (D.C. 1959) (parties were not adverse in previous matter and are not bound by it because to do otherwise would in effect compel co-defendants in such cases to file "compulsory" cross-claims; "[T]here are no compulsory cross-claims" in local courts).

---

building permit in the *Stevens* litigation. The District's assertion in the recently concluded Superior Court litigation was that because primary jurisdiction over the dispute resided elsewhere (*i.e.*, DCRA could not have challenged the validity of the building permits in the *Stevens* litigation because the mandated administrative process first must be exhausted), the District was not required to bring its "compulsory" cross-claims in the *Stevens* litigation and was not barred by *res judicata* from subsequently challenging the validity of the building permits elsewhere. The Superior Court agreed with the District's position. *See* Plaintiffs' Memo at 12 n.3.

The *Stevens'* complaint's chief allegation was that the District was not following the correct process in reviewing the owners' building permit plans and applications. The case was dismissed mainly due to a private settlement entered into by the neighbors to which the District was not a party. The Order denying the *Stevens* TRO sought against the District embraced the idea that the District's regulatory, permit-review, and enforcement process was being followed. Thus, to the extent the "merits" of the *Stevens* litigation was reached, they were decided in the District's favor—it *was* following its regulatory process, and need not be enjoined from continuing to do so. In other words, to the extent that the District there *had not yet discovered* plaintiffs' misrepresentation in their original application, that fact did not limit the District from taking whatever enforcement steps were appropriate.

Plaintiffs also assert that the doctrine of judicial estoppel precludes the District from arguing one side of an issue in one case and arguing the opposite side in a subsequent case. Plaintiffs' Memo at 19. Plaintiffs are incorrect both as to the law and the facts.

Even if plaintiffs were correct that the District had argued inconsistent positions, "this Circuit has specifically rejected the principle of judicial estoppel: 'We conclude that the judicial estoppel doctrine has no vitality in this jurisdiction.'" *Smith v. District of Columbia*, 295 F.Supp.2d 53, 54 (D.D.C. 2003) (*quoting Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980)). *See also UMWA 1974 Pension v. Pittston Co.*, 984 F.2d 469, 477 (D.C. Cir. 1993) ("[W]e have not previously embraced the doctrine of judicial estoppel in this circuit and we decline to do so in this case.") (*citing Konstantinidis*). Moreover, even if applicable, judicial estoppel is limited to a case in which the party prevailed on one of the pleadings claimed to be inconsistent. *Pyramid Securities, Ltd. v. IB Resolution*, 924 F.2d 1114, 1123 (D.C. Cir. 1991).

Here, the District never argued that plaintiffs' building permits were unconditionally valid, and certainly never prevailed on that issue.

The District has *not* taken inconsistent positions in the many manifestations of this litigation. In the *Stevens* TRO hearing, the District proffered its position at the time: from the perspective of *DCRA*, plaintiffs were then in compliance with their permits. Plaintiffs' Memo at 7. But the District took pains to point out that its Historic Preservation people might not necessarily agree with this position. DEx. 6 at 51. In fact, as noted in its Motion to Dismiss, far from attempting to "play fast and loose" with the court, the District warned everyone present at the hearing that the owners were proceeding at their own risk on any construction on the property, in the event a subsequent review discovered problems in the application(s) or plan(s). DEx. 6 at 15, 51–52. The court explicitly acknowledged that position of the District. *Id.* at 62 ("[T]hey're going forward with their eyes wide open. [S]o what I'm saying is, and I think everybody's clear, if you go forward in one of these cases, you go forward at your own risk, you go forward at your own peril."). Thus, far from being "fooled" by the District, the court there noted the District's position and accepted it for purposes of denying the TRO requested by a neighbor.

Contrary to the direct representation of plaintiffs, neither Mr. Ford nor Mr. Bello testified (nor could they have) that the building permits were "validly issued[,]" Plaintiffs' Memo at 18, because those former DCRA employees could only speak from the perspective of that agency. While it is true that Mr. Ford, then Chief Building Inspector for the District, testified that the permits were "righteous" from DCRA's perspective, Plaintiffs' Memo at 20–21, Mr. Ford also testified that he relied on the sign-off by the HPO staff person, which sign-off the District subsequently determined was erroneous. 2004 Maloney Decl. ¶ 7–8. Mr. Ford himself

acknowledges that DCRA relied on the HPO sign-off, and if HPO had not approved the application, DCRA would not have even *reviewed* it, much less approved it. Plaintiffs' Memo at 21.

There is nothing inconsistent with the District's positions throughout this litigation. Judicial estoppel is not applicable here because the District's positions were not inconsistent, and because, although DCRA issued plaintiffs' building permits, those permits were approved by DCRA based on the erroneous sign-off by a new HPO employee. *See UMWA*, 984 F.2d at 477 n.12 (judicial estoppel is disfavored because "[in *Konstantinidis*] we expressed a preference for the 'determination of cases on the basis of the true facts as they might be established ultimately.'"). The District's "failure to prosecute at an earlier stage does not estop [it] from proceeding once it finally accumulated sufficient evidence to do so." *Graham*, 222 F.3d at 1008 (citations omitted).

Finally, to the extent plaintiffs are correct regarding the interlocutory character of Judge Terrell's orders finding *res judicata* not applicable against the District, Plaintiffs' Memo at 22–23, plaintiffs fail to reveal an important limitation on that doctrine: "When two trial judges reach opposite conclusions on a purely discretionary matter (including an interlocutory matter), consistency and fairness require giving effect to the first judge's decision." *Langevine v. District of Columbia*, 106 F.3d 1018, 1025 (D.C. Cir. 1997) (Henderson, J., concurring in part and dissenting in part). Thus, while Judge Terrell's dismissal of *Robbins* was without prejudice, her interlocutory orders holding *res judicata* inapplicable to the District should be given full effect here, both out of consistency and fairness and, more importantly, because they are consistent with controlling Circuit law. *See* pp. 16–19, *supra*.

E.     Plaintiffs' Claims Regarding the "Revocation" of Their Building Permits Are Not Ripe.

Plaintiffs make repeated references to their building permits as the property of which they were unconstitutionally deprived by the District, in violation of due process. Plaintiffs' Memo at 24–27. But the District has not completed the proposed revocation of those permits, hence any claims along those lines are not ripe. Plaintiffs argue that "the District of Columbia Construction Codes entitled plaintiffs to a predeprivation hearing before their building permits could be revoked." *Id.* at 26. The District agrees unconditionally with this statement. But that hearing has not yet occurred at DCRA, where plaintiffs must exhaust their administrative remedies in this local matter. Plaintiffs' Memo at 13; PSMF ¶ 44; Elkins Decl. ¶ 28. Their claims of property deprivation are not ripe. Plaintiffs exert considerable effort discussing the "revocation" of their building permits, but that process has not yet been completed. Plaintiffs apparently want to try the validity of their building permits anywhere but at DCRA, even as the "rely" on DCRA's initial action as giving them irrevocable rights.

"[A] claim is unripe if it depends on 'contingent future events.'" *Flynt v. Rumsfeld*, 355 F.3d 697, 702 (D.C. Cir. 2004) (*quoting Texas v. United States*, 523 U.S. 296, 300 (1998). Courts should refrain from deciding cases where the injury is speculative, and may never occur, because such cases are unripe. *See Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 310 F.Supp.2d 216, 229 (D.D.C. 2004) (*citing Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).

Here, the District has proposed revoking plaintiffs' building permits (notwithstanding that plaintiffs have completed all construction), but that revocation process has not run its course; any claims to the contrary are unripe.

The agency action plaintiffs complain of is not legally "final." Generally, two conditions must be satisfied for agency action to be considered final: the action must be the "consummation" of the agency's decision-making process, and the action must determine the rights or obligations of the party (*i.e.*, have "legal consequences"). *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004) (*citing Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Here, DCRA has proposed to revoke plaintiffs' building permits, but has not yet done so, hence plaintiffs' "rights or obligations" flowing therefrom can not yet be determined.

Ripeness analysis requires courts to look at both "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *Harris*, 353 F.3d at 1011–12 (*quoting Abbott Labs.*, 387 U.S. at 149).

"In determining the fitness of an issue for judicial review we look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C.Cir.1998) (internal quotation omitted). Additionally, "hardship" to the parties does not mean direct hardship, but rather whether postponing judicial review would impose an undue burden on them or would benefit the court. *AT&T v. FCC*, 349 F.3d 692, 700, 702 (D.C. Cir. 2003) (rejecting petitioner's challenge as unripe because petitioner failed to show that postponing review would cause it hardship). *See also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (ripeness weighs whether delayed review would cause hardship to plaintiffs, whether judicial intervention would inappropriately interfere with further administrative action, and whether courts would benefit from further factual development).

Here, assuming that plaintiffs' claims should not be dismissed outright for failure to exhaust administrative remedies and because no constitutional torts have been committed, the

parties and the Court would clearly benefit by postponing review in light of the pending administrative action. There would be no hardship to plaintiffs, because all construction has been completed on the property, and all documents seized during the administrative search were returned long ago. *See* DEx. 12, Cherry Decl. ¶ 12.

Moreover, all parties would benefit from the "more concrete setting" of a full administrative hearing and record before DCRA in this essentially local-law matter. If there is any factual development that needs to occur in this matter, it should happen before the appropriate bodies to hear the underlying dispute—the local administrative agencies and, ultimately, the local courts. Judicial intervention here also could well interfere inappropriately in the ongoing administrative action at DCRA.

Finally, plaintiffs again have not explicitly clarified which aspect of due process they allege the District violated. Nevertheless, ordinarily, although "one pursuing a procedural due process claim need not exhaust his local remedies," *Tri County Indus. v. District of Columbia*, 104 F.3d 455, 462 (D.C. Cir. 1997), a plaintiff pressing a *substantive* due process claim is held to a higher burden. "[U]nless the victim of government imposition has pushed its local remedies to the hilt, it ordinarily will not be able to show the necessary substantiality." *Id.* at 459; *3883 Connecticut LLP v. District of Columbia*, 191 F. Supp. 2d 90, 95 (D.D.C. 2002), *aff'd*, 336 F.3d 1068 (D.C. Cir. 2003); *see also Covington Court, Ltd. v. Village of Oak Brook*, 77 F.3d 177, 179 (7th Cir. 1996) ("A person contending that state or local regulation of the use of land has gone overboard must repair to state court.") (*quoting River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994) and *citing Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 188–89 (1985)).

Because the plaintiffs here have not exhausted their administrative remedies, because the actions of the District do not rise to the level of a *Silverman* substantive due process violation, and because the District has given (and continues to give) plaintiffs all process due, plaintiffs claims of due process violations must be dismissed outright or, in the alternative, dismissed as unripe.

F.     <u>There Are No Material Facts In Dispute.</u>

F.     There Are No Material Facts In Dispute.

Plaintiffs' do not credibly dispute most of the District's Statement of Material Facts. Plaintiffs' "Statement of Disputed Facts," filed in opposition to the defendants' Statement of Material Facts ("SMF"), is a jumble of semantic distraction and attempts to divert the Court from the central issues involved. For instance, in response to SMF ¶ 2, plaintiffs essentially admit that their original building permit application was filed as referenced, but then try to engage in a *post-hoc* rationalization as to *why* they filled out the form as they did.

Similarly, in response to SMF ¶ 3, plaintiffs admit that they received the referenced building permit and did the construction, but attempt to deny that that construction was a "second story" under D.C. law, even though the words "second story" were never mentioned in SMF ¶ 2. Plaintiffs' renovated home has considerable new space between the "replacement roof" and the original walls. Whether called an atrium, "storage loft," mezzanine, second story, or art studio, what plaintiffs did to their home is unmistakably an "addition," both according to District law and common sense.[15]

_____

[15]     Plaintiffs acknowledge that they added an improper second story. Elkins Decl. ¶ 10. Plaintiffs then claim that, after being notified by DCRA of the illegal construction, and after speaking with Mr. Bello, they "removed enough of the loft so that the square footage of the storage loft above the first floor was no more than one-third of the square footage of the kitchen floor below." *Id.* It is true that the zoning regulations allow a "mezzanine" between floors, of no

Additionally, in response to SMF ¶¶ 4 and 12, plaintiffs' refuse to admit the obvious—that they were issued the referenced stop-work orders. Instead, plaintiffs "dispute" these facts, arguing that they were not issued *valid* stop-work orders, in an attempt to divert the Court's attention from plaintiffs' failure to pursue and exhaust the administrative process.

Also, in response to SMF ¶ 5, plaintiffs admit receiving the referenced letter, but devote almost a page of text purporting to "dispute" the legal significance of the letter—a legally irrelevant and dilatory exercise in light of the concise fact stated by the District.

SMF ¶ 7 simply noted that the District issued a notice of violation for the property. In response, plaintiffs purport to "dispute" that fact, attempting, again, to argue the *validity* of the underlying action, not the mere fact of issuance as asserted by the District.

Similarly, SMF ¶ 10 set forth a meeting of the Historic Preservation Review Board ("HPRB") and public testimony by plaintiff Robbins, but in response, plaintiffs purport to dispute these facts, discussing the legality of the meeting, their suspicions as to the District's motivations, and their conclusions as to why the District acted as it did. In the end, though, plaintiffs never deny that plaintiff Robbins made the referenced admissions.

---

more than one-third the floor space of the area below, which will not count as a "story" for zoning purposes. 11 DCMR § 199. However, notwithstanding this, *any* increase in *floor area* or *height* of an existing building is defined as an "addition." *See* § 202.0, "General Definitions" of the 1996 Building Officials & Code Administrators ("BOCA") National Building Code, formally adopted by the District at 46 D.C. Reg. 9410–9673 (Nov. 19, 1999) (*codified as* Title 12, D.C. Municipal Regulations), which defined "Addition" as "An increase in building area, aggregate floor area, height or number of stories of a structure." *See also id.*, "Alteration: Any construction or renovation to an existing structure other than repair or addition." Plaintiffs' construction indisputably added floor area and increased the height of an existing roof; any increase in "gross floor area," which specifically includes the floor area of mezzanines, 11 DCMR § 199, constitutes an "addition" under D.C. law. Moreover, common sense indicates that, regardless of *how* plaintiffs use the newly added structural volume (storage, living, art studio, etc.), it is an "addition" to the previous structure, in both floor area and height.

SMF ¶¶ 18 and 19 set forth the District's application for and execution of the administrative search warrant. Plaintiffs again purport to dispute this, by challenging the validity of the warrant.

Finally, SMF ¶ 20, in its entirety, stated: "The photographs taken during the execution of the administrative search warrant show what appears to the District to be illegal construction, outside the scope of the building permits issued to plaintiffs." Plaintiffs predictably argue that there was no illegal construction, but the District's statement did not set out that "fact" so nakedly—the District noted that *it appeared to the District* that the construction was illegal, not that the construction was, in fact, illegal. The legality of the construction, as the District has maintained from the beginning, can only properly be determined through the exhaustion of the administrative process. In any event, the material fact not at issue here is that it appeared to the District that the construction was illegal, which is the reason the District has taken the enforcement actions in dispute.

G.      The Individual Defendants Are Entitled To Qualified Immunity.

Plaintiffs' assert that the District has failed to demonstrate that the individual defendants are entitled to qualified immunity. Plaintiffs' Memo at 39. While plaintiffs correctly lay out the initial contours of qualified immunity per *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), they fail to apply subsequent, controlling case law correctly. Plaintiffs maintain the unremarkable proposition that a "reasonable government official" should know that a warrantless search is unconstitutional, but fail to recognize the good-faith exception of an officer relying on a warrant later found to be invalid, as discussed by the District *supra*. Plaintiffs also continue to speak of "revocation of building permits without a predeprivation hearing," when plaintiffs themselves

have failed to exhaust their administrative remedies; plaintiffs have demanded a hearing on DCRA's proposed revocation of their building permits and will have one in due course. PSMF ¶ 44.

Qualified immunity "protect[s] officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Gray v. Poole*, 275 F.3d 1113, 1116 (D.C. Cir. 2002) (*quoting Butz v. Economou*, 438 U.S. 478, 506 (1978)). Each of the individual defendants here was exercising his or her discretion in the public interest to enforce the District's building-code and historic-preservation laws. The defendants' actions here were analogous to the functions performed by police officers—the tracking down of information, the making of professional judgments, and the passing on of their findings to prosecutors—which functions are subject to qualified immunity. *Gray*, 275 F.3d at 1117. *See also Kalina v. Fletcher*, 522 U.S. 118, 126 (1997) (government official who served as complaining witness in swearing out affidavit to support issuance of arrest warrant entitled to qualified immunity, whereas prosecutors are entitled to absolute immunity).

Similarly, the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, waives the federal government's sovereign immunity from suits alleging torts committed by federal employees in the scope of their employment, but excludes suits where the employee was performing a "discretionary function." *See, e.g., Sloan v. HUD*, 236 F.3d 756, 759 (D.C. Cir. 2001). A challenged government action is a discretionary function if it involves "an element of judgment or choice" and if the challenged action or decision was "based on considerations of public policy." *Id.* (*quoting United States v. Gaubert*, 499 U.S. 315, 322–23 (1991)).

Plaintiffs here essentially challenge the District's decisions to investigate plaintiffs and enforce District law. "The decision to initiate a prosecution has long been regarded as a classic

discretionary function." *Id.* at 760 (*citing Moore v. Valder*, 65 F.3d 189, 197 (D.C. Cir. 1995)). *See also Gray v. Bell*, 712 F.2d 490, 513 (D.C. Cir. 1983) ("Prosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of government discretion . . . ."). In *Sloan*, the Circuit held that HUD's decision to suspend appellants from contracting with HUD was "plainly discretionary" because it involved "substantial elements of judgment" in determining whether the appellants met the "broadly stated conditions" necessary for suspension. *Sloan*, 236 F.3d at 760.

Here, each of the individual defendants is entitled to qualified immunity because they exercised substantial judgment in determining whether plaintiffs' construction violated District law, and in determining how to proceed to correct those alleged violations. Plaintiffs challenge how the District investigated them, but that investigation, which involved "the sifting of evidence, the weighing of its significance, and the myriad other decisions made during investigations plainly involve[d] elements of judgment and choice[,]" was a discretionary function, thus the individual defendants are entitled to qualified immunity. *Id.* at 762.

In determining whether government officials violated a person's constitutional rights while acting in an official capacity, "a court should review the official conduct at a particularized level: 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Fraternal Order of Police, D.C. v. Rubin*, 26 F.Supp.2d 133, 147 (D.D.C. 1998) (*quoting Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)). If that official conduct did not violate a clear right of which a reasonable person would have known, the government official is entitled to qualified immunity. Here, again, plaintiffs continue to imply that their building permits were revoked without a predeprivation hearing,

which is not the case; the administrative process is ongoing. The cases plaintiffs cite to show these "clear" rights are easily distinguishable.

In *Samaritan Inns v. District of Columbia*, 1995 U.S. Dist. LEXIS 9294 (D.D.C. 1995), *aff'd in part and rev'd in part*, 114 F.3d 1227 (D.C. Cir. 1997), the District was held liable under 42 U.S.C. § 1983 for violating the rights of an organization that provided low-cost housing to reformed drug- and alcohol-abusers. In an apparent effort to appease local opposition to the construction of such a residence, defendant officials there issued a stop-work order that was facially invalid in that it did not contain any discernible reason for its issuance. *Samaritan*, 1995 U.S. Dist. LEXIS at *32–33. In addition, when contacted by Samaritan Inns, the official who issued the stop-work order refused to provide an explanation for it. *Id.* at *28. The Court ultimately found that the District violated the federal Fair Housing Act by discriminating against handicapped persons.

In stark contrast, here the District has taken or attempted to take a number of enforcement actions, which plaintiffs are challenging through the mandated administrative process, which is all the process that is due. *See Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, ___ (2001) (unanimous decision) (If local government "makes ordinary judicial process available to respondent for resolving its . . . dispute, that process is due process."); *see also Marris v. Cedarburg Zoning Bd. of Appeals*, 1998 U.S. App. LEXIS 5494 (7th Cir. 1998) ("[T]he availability of litigation in state courts may supply the process due under the fifth amendment even if the state courts would not afford all of the relief the plaintiff seeks.") (*citing Hamlin v. Vaudenberg*, 95 F.3d 580 (7th Cir. 1996). Plaintiffs cannot reasonably complain that the District here has not been fully forthcoming in its reasons for the multiple enforcement efforts.

Similarly, in *Tri County Industries, Inc. v. District of Columbia*, 104 F.3d 455, 460 (1997), *cert. dismissed on other grounds*, 531 U.S. 287 (2001), the Court addressed appellant's procedural due process claim, bluntly finding that the District official, when he purported to orally suspend appellant's building permit, "pursued no procedure at all to assess whether the alleged change in circumstances materially undermined his agency's prior finding," 104 F.3d at 462. The District official there suspended Tri County's permit *sua* sponte at a public hearing based on inaccurate information, and did not give the company any opportunity to dispute the facts on which the suspension was based. *See American Towers, Inc.*, 146 F.Supp.2d at 34 (discussing *Tri County*). Here, plaintiffs do not assert a procedural due process claim which in any event would fail, because the District here has followed all procedure mandated by District law so that it might investigate allegedly changed circumstances. Plaintiffs have had ample opportunity to dispute the facts on which the District's enforcement actions were based; they simply disagree with the conclusions. Plaintiffs themselves have failed to exhaust the administrative process they claim is due them; there has not yet been a hearing on DCRA's proposed revocation of the building permits.

H.     Plaintiffs Do Not Properly Claim Violation of 42 U.S.C. § 1983.

Plaintiffs allege that they have sufficiently made out a claim of 42 U.S.C. § 1983, because they are no longer required to allege "a custom or policy" of the District. Plaintiffs' Memo at 38. Plaintiffs are incorrect as a matter of law.

Controlling law holds that to state a claim under § 1983, plaintiffs must allege "that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (*citing Collins v. City of Harker Heights*, 503 U.S. 115, 120

(1992)). Plaintiffs suing the District under § 1983 "must show that municipality agents or employees acted 'pursuant to official municipal policy of some nature.'" *Ali v. District of Columbia*, 278 F.3d 1, 8 (D.C. Cir. 2002) (*quoting Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978)). *See also Ashford v. District of Columbia*, 306 F.Supp.2d 8, 12 (D.D.C. 2004) ("A municipality, such as the District of Columbia, may be held liable under § 1983 'only when the execution of its official policy or custom is responsible for the deprivation of constitutional rights.'") (*citing Morgan v. District of Columbia*, 824 F.2d 1049, 1058 (D.C.Cir.1987)).

It is insufficient to show that the District employed the alleged tortfeasor, a plaintiff must identify a municipal policy or custom that *caused* the alleged injury. *Bd. of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403 (1997).

Plaintiffs must demonstrate the District's "deliberate indifference towards [their] constitutional rights . . . ." *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) (*quoting City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)). "Deliberate indifference" lies somewhere between the poles of negligence and purpose or knowledge. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

Deliberate indifference is determined objectively, "by analyzing whether the municipality knew or should have known of the risk of constitutional violations," and yet failed to respond as necessary. *Baker*, 326 F.3d at 1307. Plaintiffs must show that the government official knew of and disregarded an excessive risk; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Moreover, if the government officials alleged to have committed the constitutional violations lack "final policymaking authority," their mere exercise of discretion, not in service of any municipally established policy, is insufficient to render the District liable. *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (*quoting Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989)).

Plaintiffs have utterly failed to meet this high burden. Plaintiffs cannot prove that the *District itself* had a policy, custom, or practice of unconstitutionally enforcing its zoning, building-permit, or historic-preservation laws.

Furthermore, plaintiffs must show a course deliberately pursued by the District, as opposed to an action taken unilaterally by nonpolicymaking employees, and "an affirmative link between the [District's] policy and the particular constitutional violation alleged." *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (*quoting Oklahoma City v. Tuttle*, 473 U.S. 925 (1985) (plurality opinion)). For liability to attach to the District, plaintiffs must provide specific and detailed evidence of a continuing policy or pattern of unconstitutional conduct that was either condoned or deliberately ignored by the controlling municipality. *Daskalea*, 227 F.3d at 441–42; *Carter*, 795 F.2d at 125–26 (plaintiffs must prove "a persistent, pervasive practice, attributable to a course deliberately pursued by *official policy-makers*, one that caused the deprivation of constitutional rights plaintiffs [allegedly] experienced.") (emphasis added). *See also Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. 1988); *Byrd v. District of Columbia*, 297 F.Supp.2d 136, 139 (D.D.C. 2003) (plaintiff's evidence did not stand up to "the level of exacting proof demanded by . . . this Circuit . . . .").

Plaintiffs' claims under 42 U.S.C. § 1983 must be dismissed.

III. Conclusion

The defendants' actions here do not violate any of the fundamental principles of the Constitution.

For the foregoing reasons, the defendants move to dismiss the complaint or, in the alternative, for summary judgment, and to deny plaintiffs' cross-motion for partial summary judgment. Alternative proposed Orders are attached hereto.

DATE: June 18, 2004                    Respectfully submitted,


                                       ROBERT J. SPAGNOLETTI
                                       Attorney General, D.C.

                                       GEORGE C. VALENTINE
                                       Deputy Attorney General, D.C.
                                       Civil Litigation Division

                                       *R. Love/ajs*
                                       _____
                                       RICHARD S. LOVE, D.C. Bar No. 340455
                                       Chief, Equity I
                                       441 Fourth Street, N.W., 6th Floor South
                                       Washington, D.C. 20001
                                       Telephone: (202) 724-6635
                                       Facsimile: (202) 727-0431

                                       *Andrew J. Saindon*
                                       _____
                                       ANDREW J. SAINDON, D.C. Bar No. 456987
                                       Assistant Attorney General
                                       Equity 1
                                       441 Fourth Street, N.W., 6th Floor South
                                       Washington, D.C. 20001
                                       Telephone: (202) 724-6643
                                       Facsimile: (202) 727-0431